## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **ROBERT WEGNER, M.D.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. _____** |
| **TENET PHYSICIAN RESOURCES,** ) | |
| **ST. FRANCIS PHYSICIAN NETWORK, LLC ,** ) | |
| **ST. FRANCIS HOSPITAL, and** ) | |
| **TENET HEALTHCARE CORPORATION,** ) | |
| ) | |
| **Defendants.** ) | |

### <u>VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

Plaintiff Dr. Robert Wegner, by and through counsel, states as follows:

### INTRODUCTION

1.      This case arises from the retaliatory termination of Dr. Robert Wegner, a fellowship-trained bariatric surgeon who built one of the most successful MBSAQIP-accredited bariatric programs in the country.

2.      After Dr. Wegner refused to unethically and illegally perform specific elective bariatric surgeries, without adequate long-term care and proper credentialing, Defendants terminated him, spread false rumors, and installed unqualified providers in his place.

3.       Dr. Wegner brings this action for damages and injunctive relief under the Emergency Medical Treatment and Labor Act (EMTALA), Tennessee contract and tort law, and other state statutory protections.

## PARTIES

4.      Plaintiff Robert Wegner, M.D., (hereinafter, "Plaintiff" or "Dr Wegner") is a licensed physician and resident of Tennessee.

5.      Defendant Tenet Physician Resources (hereinafter, "Defendant" or "Tenet") is a Delaware corporation authorized to do business in Tennessee.

6.      Defendant Saint Francis Physician Network, LLC, located in Memphis, Tennessee, is a subsidiary of Tenet Healthcare Corporation.

7.      Defendant St. Francis Hospital (hereinafter "the Hospital") is a Tennessee corporation located in Memphis.

8.      Defendant Tenet Healthcare Corporation (hereinafter, "Tenet Tx") is a Texas-based healthcare company that owns and controls operations at St. Francis Hospital.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction under 28 U.S.C. § 1331 because the case arises under federal law, specifically EMTALA, 42 U.S.C. § 1395dd.

10.      The Court has supplemental jurisdiction over related state claims under 28 U.S.C. § 1367.

11.      Venue is proper in this district under 28 U.S.C. § 1391 because all events occurred in the Western District-Western Division of Tennessee.

## FACTUAL ALLEGATIONS

### Dr. Wegner's Role and MBSAQIP Credentialing

12.      Beginning in August, 2010, Dr. Wegner, a fellowship-trained bariatric surgeon, served as the sole bariatric surgeon and MBSAQIP Program Director at St. Francis for over 15 years earning national recognition for patient outcomes, surgical volume, and professional

integrity, until his wrongful termination in breach of his contract and in retaliation for engaging in protected activity from February 28, 2025 to March 20, 2025.

13.     Over the course of his tenure, Dr. Wegner performed nearly 6,000 bariatric procedures and led the hospital through multiple MBSAQIP accreditations, consistently delivering results that positioned the program among the most reputable in the region (Exhibit 1, MBSAQIP Standards, p. 7).

14.     Defendants and Dr. Wegner have ethical and legal duties to provide follow up care to these patients under medical ethics rules, state law, and federal law as will be detailed herein.

15.     In 2024, Defendants promoted Dr. Wegner in a national bariatric campaign and which described Dr. Wegner as the "gold standard" among Tenet's surgeons.

16.     During MBSAQIP site reviews in August 2024, Reviewer Dr. Jay Suggs recommended that St. Francis revise its credentialing policy to require formal bariatric fellowship training—an essential safeguard for continued accreditation and patient safety (Exhibit 1, MBSAQIP Standards, pp. 5–7).

17.     Dr. Wegner led the creation and approval of this policy, which passed all of the Hospital's required internal committees.

18.     This policy was adopted without objection by the Credentials Committee on September 9, the Medical Executive Committee on September 12, and the Governing Board on September 26, 2024, becoming the controlling credentialing standard for bariatric privileges at St. Francis (Exhibit 2, SFH Credentialing Policy, p. 2).

19.     This new credentialing policy, authored by Dr. Wegner, mandated a completed bariatric fellowship, submission of a case log, and a formal letter of competency, aligning the hospital's requirements with national standards (Exhibit 2, SFH Credentialing Policy, pp. 1–2)

20.     These standards were designed to ensure patient safety and compliance with MBSAQIP.

21.     Rather than reinforce these guardrails for patient safety, hospital executives began quietly working to circumvent them—seeing the policy not as a framework for care, but as an obstacle to cost-saving personnel changes.

**Dr. Wegner's Contractual Rights and Obligations**

22. On or about June 1, 2022 Dr. Wegner and Saint Francis Physician Network, LLC executed a Physician Employment Agreement (hereinafter, "PEA") and a Directorship Agreement (hereinafter, "DA") (PEA and DA collectively referred to herein as "Wegner Agreements") which governs the terms and conditions of Dr. Wegner's employment with Defendants.  An unsigned copy of the PEA is attached hereto as Exhibits A and incorporated herein by reference.  Dr Wegner does not possess signed copies of the Wegner Agreements as Defendants have never provided him with a copy.  Dr. Wegner has used and relied upon Exhibit A for years as his reference to the terms and conditions his employment.

23.     The PEA is a five-year contract provides for a five-year term beginning on or about June 1, 2022, which remained in effect at the time of his termination in March 2025. The agreement guaranteed his compensation and terms of employment through May 31, 2027.

24.     The PEA contract states that the employer will consult with Dr. Wegner prior to hiring or engaging another bariatric surgeon in the area. Dr. Wegner was never consulted about the hiring of Dr. George Woodman, despite this express contractual requirement.

25.     The PEA also outlines Dr. Wegner's duties to ensure continuity of care, respond to urgent cases and transfers, document care accurately, and comply with applicable credentialing and hospital standards. His refusal to perform elective surgeries without credentialed coverage was consistent with these duties.

26.     The PEA affirms Dr. Wegner's right to exercise independent medical judgment in the care of patients. His decision not to proceed with elective cases without follow-up care was a direct exercise of that discretion.

27.     The PEA provides that termination for cause requires written notice of any alleged performance deficiency and at least 30 days to cure, unless the issue involves extreme circumstances like loss of licensure or immediate harm. No such notice or opportunity to cure was provided before his termination.

28.     The PEA further emphasizes the importance of maintaining hospital credentials and medical staff privileges at St. Francis, both of which Dr. Wegner held without restriction at the time of his removal.

29.     The PEA also incorporates Tenet's ethics and compliance program, including protections for whistleblowers. Dr. Wegner's actions in refusing unsafe surgeries and raising concerns about emergency care coverage were fully consistent with those compliance obligations.

**Contract Pressure and Escalating Retaliation and Intimidation Following Ethical Objections**

30.     Upon information and belief at some point Defendants desired to renegotiate the PEA to make the ongoing operation of Dr. Wegner's practice to be more profitable for Defendants.

31.     On December 30, 2024, Defendants called a meeting which included Memphis Market Manager Pat Lloyd and Memphis Market Assistant Leslie Malone, in an attempt to engage Dr. Wegner to renegotiate the PEA.

32.     Defendants proposed to eliminate Dr. Wegner's base salary and other compensation in favor of compensation which would totally be based on Dr. Wegner's productivity.

33.     The proposed change violated his five-year employment PEA, which still had more than two years remaining (30 months), and represented a sharp and unjustified demotion for one of the system's most senior and successful surgeons

34.     Dr. Wegner evaluated the proposal and declined, because this framework did not benefit him and he liked the contractual arrangements which had been in place since June, of 2022 and would remain in force until June of 2027 some 30 months in the future.

35.     Upon information and belief when Dr. Wegner declined the proposal and communicated to Defendants that he was not interested in renegotiating the PEA, Defendants in violation of the PEA began a campaign of threats and pressure designed to force him back to the negotiating table or force him to resign so Defendants could make more profitable arrangements with another physician.

36.     In the weeks that followed, TPR escalated its pressure campaign—offering even worse terms and threatening to reassign or eliminate his trusted nurse practitioner, Vanessa Williams, who had supported him for more than a decade and leave him with no professional support.

37.     On February 28, 2025, Defendants fired Dr. Wegner via a 90-day without-cause termination notice (Attached hereto, as Exhibit 3, Notice of Termination), pursuant to the terms of the PEA.

38.     The PEA provides for a 90-day notice provision.

39.      Defendants told Dr. Wegner that during the 90-notice period it is requiring him to continue to perform elective bariatric surgeries and provide emergency care to patients as directed by Defendants.

40.     Even then, Dr. Wegner remained committed to his patients, and agreed to continue covering emergency care but refused to perform elective bariatric surgeries during this period as he could not ethically or legally perform such elective surgical cases without a qualified and credentialed successor and a follow up treatment program which complies with the Hospital's policies, Tennessee Medical Ethics, Federal and State laws and so declined to perform those elective surgeries as illegal and unethical. (Exhibit 4, ASMBS Ethics Letter, p. 1).

41.     Dr. Wegner made this decision based on his extensive professional experience, which confirmed that a predictable percentage of bariatric patients would present to the emergency room after surgery with serious complications (Exhibit 4, ASMBS Ethics Letter, p. 1).

42.     Dr. Wegner knew that under federal patient protection laws, such as the Emergency Medical Treatment and Labor Act (EMTALA), patients presenting to the emergency room after bariatric surgery would be entitled to an appropriate medical screening examination and stabilization, which in bariatric cases often requires evaluation by a credentialed bariatric surgeon (Exhibit 1, MBSAQIP Standards, p. 5).

43.    Because St. Francis had no such credentialed backup in place, Dr. Wegner warned hospital leadership that continuing to perform elective surgeries without ensuring appropriate follow-up coverage would violate core ethical and medical guidelines governing emergency care, continuity of care, and specialist availability (Exhibit 1, MBSAQIP Standards, pp. 5–7)

44.    Patients who undergo bariatric surgery are a medically vulnerable population and require skilled, long-term follow-up by professionals trained in the nuances of bariatric physiology, complications, and recovery (Exhibit 4, ASMBS Ethics Letter, p. 1).

45.    Dr. Wegner's position was later supported by the Chair of the Ethics Committee for the American Society for Metabolic and Bariatric Surgery (ASMBS), who stated in a March 31, 2025 letter that Dr. Wegner had appropriately refused to proceed with surgeries when no credentialed coverage was available, in accordance with ASMBS and MBSAQIP ethical and clinical standards (Exhibit 4, ASMBS Ethics Letter, p. 1).

46.    In response to these warnings, TPR acknowledged—on the record—that Dr. Wegner's concerns about continuity of care were valid (Exhibit 3, Notice of Termination, p. 1).

47.    Despite this, Pat Lloyd pressured him to proceed anyway, texting that those patients had "paid money."

48.    Dr. Wegner again refused, citing MBSAQIP and ASMBS standards. He recommended honest communication and refunds for patients, rather than deception and unsafe shortcuts (Exhibit 1, MBSAQIP Standards, pp. 6–7).

49.    Defendants told Dr. Wegner that he was not to contact patients and that office manager Cora Austin would handle any communication—shutting down transparency and leaving patients in the dark.

**Sabotage and Misinformation**

50. On March 3, 2025, Pat Lloyd convened a private meeting of Tenet Physician Resources (TPR) and St. Francis Hospital leadership to discuss the replacement of Dr. Robert Wegner and the reassignment of his staff.

51. Dr. Wegner was deliberately excluded from this meeting despite the fact that its purpose centered on his termination and replacement.

52.  Attendees at the meeting included Pat Lloyd, Chief Strategy Officer, Karun Gadiparthi, Nurse Director Amanda Talley, and Bariatric Program Coordinator Leslie Albers, among others.

53.     During the meeting, Karun Gadiparthi stated that he had heard Dr. Wegner's termination was connected to allegations of Medicare fraud, sexual harassment, and that he had been arrested.

54.     Gadiparthi specifically asked whether the rumors were true that Dr. Wegner had committed Medicare fraud or had been arrested. —statements that improperly conflated Dr. Wegner with Dr. Sanjeev Kumar, a Memphis physician who had, in fact, been arrested on or about February 28, 2025, and indicted on March 3, 2025, on 23 federal charges including healthcare fraud, coercion for sex acts, and misuse of medical devices. See:

https://www.commercialappeal.com/story/news/local/2025/03/03/memphis-doctor-indicted-sanjeev-kumar/81149858007/

https://www.actionnews5.com/2025/02/28/east-memphis-doctor-indicted-23-federal-charges-alleging-coercion-sex-acts-misuse-medical-devices-healthcare-fraud/

55.     Amanda Talley responded that she had heard the same rumors but did not know whether they were true.

56.    Pat Lloyd and other meeting participants did not dispute, correct, or seek clarification regarding the defamatory allegations raised by Gadiparthin which they KNEW to be false and damaging to Dr. Wegner.

57.    The participants failed to distinguish that the person actually arrested on or about March 3, 2025, was Dr. Sanjeev Kumar, a separate physician, and not Dr. Robert Wegner.

58.    Karun Gadiparthi either knowingly or negligently conflated the arrest of Dr. Sanjeev Kumar with Dr. Wegner's absence from work following his termination on February 28, 2025.

59.    Pat Lloyd and the other leadership attendees failed to correct this false association, thereby permitting the defamatory statement to persist unchallenged.

60.    The defamatory speculation regarding Dr. Wegner's alleged arrest and misconduct was not contained within the March 3 meeting and was later "published" beyond the defendants' organization.

61.    On March 3, 2025, Dr. William "Rusty" Vance Shappley III and Dr. David A. Gubin, both urologists in private practice with The Urology Group, P.C. in Memphis, contacted Physician Coordinator Jenny Lovitt regarding rumors about Dr. Wegner's alleged criminal conduct and professional misconduct.

62.    Dr. Shappley and Dr. Gubin are not employed by TPR or St. Francis Hospital and had no internal role in Dr. Wegner's employment, evidencing the external publication of the defamatory content.

63.    The dissemination of these false allegations to Drs. Shappley and Gubin constitutes a publication of defamatory material to third parties unaffiliated with the defendants.

10

64.    In addition to facilitating the spread of disinformation, leadership proceeded to finalize a plan to assign Vanessa Williams to the GI clinic under the supervision of Dr. Bowden, a gastroenterologist who was not a surgeon, much less a bariatric surgeon.

65.    Subsequent, they also moved forward with plans to replace Dr. Wegner with Dr. George Woodman—a general surgeon who lacked bariatric fellowship training and was ineligible under the newly adopted credentialing policy (Exhibit 2, SFH Credentialing Policy, p. 2).

66.    Wegner was never consulted about Woodman's recruitment, in direct violation of the provision in his contract requiring consultation before hiring another bariatric surgeon, even though Dr. Wegner had offered on March 4, 2025, to stay on during a transition period to help recruit and onboard a credentialed replacement.

67.    On March 17, 2025, Pat Lloyd informed Dr. Wegner by email that Dr. Woodman would be taking over the program.

68.    At a meeting on March 18, Dr. Wegner objected, pointing to the credentialing policy and demanding to know how Woodman met the criteria.

69.    Lloyd and Malone offered no explanation and made no effort to address Dr. Wegner's objection.

70.    That same day, Dr. Wegner sent a written follow-up reiterating his objection.

71.    Dr. Wegner's offers, objections, and solutions were ignored. No investigation was initiated. No credentialing review was undertaken.

72.    Just two days later, on March 20, TPR issued a new termination letter retroactively withdrawing the "without cause" notice and replacing it with a "for cause" termination under Section 8(a), effective immediately (Exhibit 3, Notice of Termination, p. 1).

73.     The "for cause" letter claimed Dr. Wegner's refusal to proceed with elective surgeries constituted conduct "materially detrimental to the care of your patients," despite the hospital having no credentialed surgeon available to assume follow-up care for those very patients (Exhibit 3, Notice of Termination, p. 1).

74.     The same letter acknowledged that Dr. Wegner was the only credentialed bariatric surgeon in the program and that he had refused to proceed only because no coverage existed—a fact further supported by the hospital's own credentialing standards (Exhibit 3, Notice of Termination, p. 1; Exhibit 2, SFH Credentialing Policy, pp. 1–2).

75.     Dr. Wegner's salary was cut off, clinic access revoked, and ability to treat patients and supervise team members—including Vanessa Williams—eliminated overnight.

76.     The termination was issued without prior written notice, without any opportunity to cure, and in violation of the PEA's explicit language.

77.     The Right to Cure clause in the PEA states:

> ***"Before proceeding with termination for any alleged performance deficiency—except in extreme cases such as loss of licensure or immediate harm—the employer must deliver written notice of the issue and afford the physician at least thirty days to cure, or longer if reasonably required."***

78.     No such notice was provided. No performance issue was ever documented. There was no patient harm, only a refusal to participate in patient harm.  There was no allegation of clinical misconduct or poor patient outcomes. Dr. Wegner was not given any opportunity to correct or respond to concerns prior to termination.

79.     By removing the only credentialed bariatric surgeon and replacing him with someone unqualified, St. Francis not only ignored its credentialing policy—it effectively dismantled it (Exhibit 2, SFH Credentialing Policy, p. 2).

80.     On March 4, Defendants presented Dr. Wegner with a written plan to implement this model.

81.     Dr. Wegner rejected the plan as unethical and offered to remain during a transition to a qualified replacement.

82.     His offer was ignored.

83.     Staff began circulating damaging rumors, and no public correction was made.

84.     On March 17, Dr. Wegner was told Dr. George Woodman would take over the program.

85.     Dr. Wegner objected, showing Woodman lacked fellowship training required under the credentialing policy.

86.     MBSAQIP site reviewer Dr. Suggs and the ASMBS Ethics Committee confirmed the situation was unethical and dangerous.  (Exhibit 4, ASMBS Ethics Letter).

87.     On March 20, via letter (Exhibit 3, Notice of Termination). Defendants terminated Dr. Wegner "for cause," falsely alleging his refusal to perform surgeries violated the PEA.

88.     Notably, at no point did Defendants invoke or even reference the "Right to Cure" clause set forth in Section 8 of the PEA.

89.     This provision requires that, before proceeding with termination for any alleged performance deficiency—except in extreme cases such as loss of licensure or immediate harm—the employer must deliver written notice of the issue and afford the physician at least thirty days to cure, or longer if reasonably required.

90.     The clause is not a formality; it is a critical contractual safeguard intended to foster open communication, allow remediation, and preserve continuity of patient care before resorting to the most drastic action: termination.

91.    Dr. Wegner was never given that opportunity. No formal notice of deficiency was issued. No conversation was initiated to address concerns. No chance was provided to develop a collaborative transition plan or propose alternatives.

92.    Instead, Defendants escalated abruptly from a without-cause termination to a with-cause dismissal—circumventing their own contractual obligations at a time when the provision was most essential: amid an ongoing patient care crisis.

93.    Had Defendants acted in accordance with the PEA, Dr. Wegner could have remained in place temporarily while assisting in the recruitment and onboarding of a qualified, credentialed successor. Dr. Wegner verbally proposed this exact solution to Pat Lloyd on March 4, 2025.

**Breakdown of Leadership and Patient Risk**

94.    Instead, Defendants stripped Dr. Wegner of this compensation, hospital access and privileges, medical malpractice insurance, and medical and practical authority to practice medicine at the Hospital.

95.    In the meantime, Defendants' ordered Vanessa Williams, Dr. Wegner's nurse practitioner to continue treating complex post-operative patients without a licensed Physician's supervision as required by Tennessee law and medical ethics.

96.    On March 24, ER Director Dr. Michael Washington called Dr. Wegner for guidance, unsure how to manage patients.

97.    No transition plan was given to hospital staff.

98.    Chief Medical Officer Dr. David Schwartz failed to intervene, take action, or respond to concerns.

99.    Dr. Schwartz was informed of patients needing future procedures and took no steps to ensure continuity.

100.    He failed to correct false rumors and allowed misinformation to spread.

**Legal Violations and Harm**

101.    The named administrators and leaders either enabled or directed violations of law, policy, and accreditation rules.

102.    Dr. Wegner's ethical refusal to participate in illegal practices which resulted in unsafe care was met with retaliation including his illegal termination.

103.    Defendants' conduct has caused severe damage to his reputation, income, and ability to practice.

**Patient Safety Failures, Unchecked Risk, and Emergent Harm**

104.    Despite repeated warnings and correspondence—including service of a litigation hold—Defendants have taken no steps to clarify Dr. Wegner's status, safeguard patients, or enact a lawful transition plan.

105.    Since Dr. Wegner's termination, St. Francis failed to notify ER physicians, hospitalists, nurse practitioners, or referring providers that the hospital no longer had a credentialed bariatric surgeon.

106.    This inaction has escalated the matter from a legal dispute to a public health crisis.

107.    As a result, Dr. Wegner continued receiving consult requests and protected patient information, even though he had no legal authority, privileges, or malpractice coverage.

108.    Dr. Wegner is a protected whistleblower under federal and state law and has formally notified Defendants of his intent to pursue those claims.

**Incident on March 31, 2025:**

109.    On the morning of Monday, March 31, Dr. Wegner received a call from the St. Francis ER secretary requesting a consultation for a former bariatric patient presenting with post-operative complications.

110.    The patient had been transferred from Baptist Hospital with a gastric ulcer and possible fluid collection at the surgical site—conditions that may require emergency surgery.

111.    The consult was ordered by Dr. Martin Duclos, head of the hospitalist group, who was unaware of Dr. Wegner's termination and expected him to respond.

112.    Dr. Wegner was placed on the phone with the bedside nurse, who believed he was still on staff, and asked to direct care.

113.    Dr. Wegner no longer had legal privileges, malpractice coverage, or the authority to treat patients, yet was still being contacted for clinical decisions.

114.    This created not only grave patient safety concerns, but also constituted a potential HIPAA violation.

115.    Attempting to redirect care, Dr. Wegner contacted Dr. Alan Hammond, head of general surgery, and asked his group to evaluate the patient.

116.    No consult note was recorded, and no evaluation took place.

117.    On April 1, 2025, the patient was admitted to the medical floor—without ever being evaluated by a credentialed surgeon, despite being a transfer case with a known post-op complication (Exhibit 1, MBSAQIP Standards, pp. 9–10).

118.    Bariatric nurse practitioner Dawn Matz contacted Dr. Wegner again—like others, she had not been informed that he had been terminated.

119.    When asked who was covering bariatric consults, nurse Matz responded, "No one, I guess."

**Incident of April 4, 2025:**

120.    On the evening of April 4, 2025, the St. Francis Transfer Center contacted Dr. Robert Wegner, attempting to route a bariatric surgical patient to him for care.

121.    Dr. Wegner informed the referring provider that he was unavailable and that they needed to call the transfer center and get a surgeon from St. Francis to accept the transfer.

122.    On the morning of April 5, 2025, Dr. Wegner proactively called the Transfer Center to follow up and ask what had happened to the patient who had been discussed the night before.

123.    The Transfer Center informed Dr. Wegner that the patient had, in fact, been transferred to St. Francis Hospital on Park, and that the transfer was accepted not by a bariatric surgeon but by Dr. Johnston, an emergency room physician. No surgeon was consulted prior to the acceptance of the patient.

124.    This confirmed that St. Francis was knowingly accepting surgical emergency transfers without a credentialed bariatric surgeon on staff or on call, and doing so after being explicitly warned that Dr. Wegner could not accept the case. As Dr. Wegner noted at the time, "I would understand if the patient showed up at St. Francis on their own—but accepting transfers is a different story." The hospital's actions constituted a reckless disregard for patient safety and a dangerous breach of standard protocol (Exhibit 1, MBSAQIP Standards, pp. 5–6; Exhibit 2, SFH Credentialing Policy, p. 2).

**Organizational Negligence and Abandonment**

125.    The MBSAQIP Accreditation Standards require centers to be able to recognize and treat metabolic and bariatric surgery complications. These standards explicitly state that written transfer agreements cannot substitute for having credentialed surgical care on-site.

126.    Chief Medical Officer Dr. David Schwartz was informed that there were specific bariatric patients still in need of follow-up procedures after Dr. Wegner's termination.

127.    No formal announcement was made to staff or referring networks, and no replacement physician with appropriate credentials was put in place (Exhibit 2, SFH Credentialing Policy, p. 2; Exhibit 1, MBSAQIP Standards, pp. 7–9).

128.    At present, patients with complex surgical complications are still being admitted to St. Francis Hospital with no credentialed bariatric surgeon on call, no clinical supervision, and no transition-of-care protocol in place.

129.    If a center lacks the capability to manage the full range of bariatric complications, it must have a signed, written transfer agreement with a facility equipped to provide comprehensive bariatric care. At the time Dr. Wegner was terminated, St. Francis had no credentialed bariatric surgeon and no such transfer agreements in place.

130.    The emergency department, hospitalists, bariatric nurse practitioners, and general surgery teams are operating in a state of complete misinformation and organizational failure.

131.    Despite this, the hospital continued to accept emergency bariatric transfers—including the April 4–5, 2025 case accepted by an ER physician without surgical consultation. This violated MBSAQIP standards, placed patients at risk, and confirmed Dr. Wegner's warnings that continuing to accept such cases without proper coverage created a dangerous and noncompliant environment (Exhibit 1, MBSAQIP Standards, pp. 5–6).

132.    Dr. Wegner remains the only medical professional attempting to redirect care and protect patients, despite being stripped of his title, authority, access, and legal protections to do so safely or lawfully.

**Professional destruction and reputational harm**

133.    Dr. Wegner's abrupt termination and the hospital's silence left patients confused, uncared for, and unaware that their surgeon had been removed. Many patients were deprived of continuity of care, and several presented to the ER in distress, unaware that Dr. Wegner was no longer available to treat them.

134.    TPR enforced a non-compete clause that prohibited Dr. Wegner from practicing within a 30-mile radius, effectively eliminating his ability to maintain his bariatric surgery practice in Memphis. As a result, he has lost his income, his referral base, and his access to the patient population he served for over 15 years. The enforcement of this clause has not only caused significant financial loss—it has functionally exiled him from his own professional community.

135.    At the same time, defamatory rumors were allowed to circulate internally—accusing Dr. Wegner of Medicare fraud and even criminal arrest—without any correction or public clarification. These rumors, combined with the silence surrounding his removal, led to a widespread perception that he had acted unethically or abandoned his duties.

136.    Referring providers, unaware of the facts or Dr. Wegner's ethical position, ceased sending patients. His referral network—carefully built over nearly two decades—collapsed in a matter of weeks. The damage to his professional relationships and reputation has been immediate, extensive, and irreversible.

137.    Although Dr. Wegner has received written support from national leaders, including Dr. John Baker, Chair of the ASMBS Ethics Committee, affirming that his refusal to operate without appropriate follow-up coverage was ethically required (Exhibit 4, ASMBS Ethics Letter, p. 1), that validation has not repaired the local reputational harm inflicted by his employer.

138.    Dr. Jay Suggs, MBSAQIP's site reviewer, similarly confirmed that the credentialing policy authored by Dr. Wegner was appropriate and that it was professionally correct to pause elective cases until a qualified successor was secured (Exhibit 1, MBSAQIP Standards, pp. 5–7).

139.    Despite this national-level validation, Dr. Wegner remains professionally isolated, emotionally distressed, and unable to resume his practice. The damage to his career, reputation, and mental health is ongoing and irreparable without judicial relief. His losses include not just income and patient access, but also his standing in the surgical and medical community—harms that cannot be undone by money alone.

## CLAIMS FOR RELIEF

### COUNT I – RETALIATION UNDER EMTALA, 42 U.S.C. § 1395dd(i)

(Against All Defendants)

140.    Plaintiff incorporates by reference paragraphs 1 through 86.

141.    The Emergency Medical Treatment and Labor Act (EMTALA) prohibits hospitals from penalizing or taking adverse action against physicians who refuse to participate in conduct that violates its mandates.

142.   EMTALA's whistleblower protection clause, 42 U.S.C. § 1395dd(i), expressly forbids hospitals from retaliating against individuals who report or refuse to engage in practices that violate patient protection standards.

143.   Defendants attempted to compel Dr. Wegner to perform elective bariatric surgeries without adequate post-operative care in place and without a credentialed, fellowship-trained replacement—conduct that directly contravenes EMTALA's requirement for appropriate follow-up treatment.

144.   Dr. Wegner refused to participate in these practices, citing both legal and ethical constraints, including the MBSAQIP credentialing policy and ASMBS Code of Ethics.

145.   Defendants responded by escalating their retaliation: first issuing a without-cause termination, then shifting to a with-cause termination, blocking Dr. Wegner's salary, removing him from patient care, cutting off his access, and falsely portraying him as a risk to patients.

146.   Even after his termination, Defendants failed to clarify his status internally, resulting in multiple clinical staff—including hospitalists, emergency physicians, and nurse practitioners—contacting Dr. Wegner for patient consults despite his lack of privileges, malpractice coverage, or legal authority.

147.   The hospital's conduct placed patients, including a former post-operative transfer from Baptist Hospital, at direct medical risk and left critical surgical care responsibilities unassigned.

148.   Defendants' retaliation and failures to correct the systemic danger violated EMTALA and caused substantial harm to Dr. Wegner's reputation, income, and professional standing.

## COUNT II – BREACH OF CONTRACT

(Against Tenet Physician Resources and St. Francis Physician Network, LLC)

149.    Plaintiff incorporates by reference paragraphs 1 through 95.

150.    Dr. Wegner entered into a five-year employment contract with Tenet Physician Resources and St. Francis Physician Network, LLC, which included specific terms regarding compensation, termination procedures, medical judgment autonomy, and involvement in the recruitment and credentialing of bariatric surgeons.

151.    TPR and St. Francis Physician Network, LLC attempted to change Dr. Wegner's compensation model from a salary-plus-incentive to a pure productivity-based formula with clawbacks.

152.    When Dr. Wegner refused this change, TPR and St. Francis Physician Network, LLC retaliated with threats to remove staff and ultimately issued a without-cause termination.

153.    After Dr. Wegner raised legitimate concerns about patient safety and continuity of care, TPR and St. Francis Physician Network, LLC escalated the retaliation to a for-cause termination under Section 8(a), stripping him of his rights without observing contractual notice and review provisions.

154.    These actions constitute a material breach of Dr. Wegner's contract, depriving him of compensation, continuity protections, and professional autonomy guaranteed under the agreement.

## COUNT III – VIOLATION OF THE TENNESSEE PUBLIC PROTECTION ACT (TPPA)

(Against All Defendants)

155.    Plaintiff incorporates by reference paragraphs 1 through 101.

156.    The TPPA, Tenn. Code Ann. § 50-1-304, protects employees from discharge or other adverse employment actions when they refuse to remain silent about or participate in illegal or unsafe activity.

157.    Dr. Wegner repeatedly refused to participate in illegal elective surgeries. Defendants wanted him to perform elective surgeries without appropriate post-operative care and without a credentialed replacement in violation of EMTALA and accreditation standards.

158.    He raised these objections to TPR, St. Francis Hospital, and their executives, including Pat Lloyd, Leslie Malone, and others.

159.    Defendants disregarded these concerns, then retaliated against Dr. Wegner for refusing to remain silent, ultimately terminating his employment and disseminating damaging rumors.

160.    This conduct violates the TPPA and entitles Dr. Wegner to lost wages backpay and future pay, compensatory damages and all other remedies provided by law.

## COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

### (Against All Defendants)

161.    Plaintiff incorporates by reference paragraphs 1 through 107.

162.    Dr. Wegner maintained long-standing physician-patient relationships and had a legitimate business expectancy in continuing to treat his existing and future bariatric patients.

163.    Defendants intentionally interfered with these relationships by denying him access to patients and records, falsely characterizing his departure, and installing unqualified personnel to assume his responsibilities.

164.    These actions were undertaken without proper clinical transition or disclosure to patients and were designed to harm Dr. Wegner's reputation and interfere with his practice.

165.    As a direct and proximate result, Dr. Wegner has suffered loss of professional opportunities, goodwill, and economic damages.

## COUNT V – DEFAMATION

(Against St. Francis Hospital and Tenet Healthcare Corporation)

166.    Plaintiff incorporates by reference paragraphs 1 through 112.

167.    Senior hospital officials, including Amanda Talley and Karun Gadiparthi, circulated and failed to correct defamatory rumors that Dr. Wegner had been arrested and had committed Medicare fraud.

168.    These statements were false, made to important officials within the hospital, which were ultimately published to third parties and made with reckless disregard for the truth or falsity of the allegations.

169.    The hospital's refusal to issue a correction, despite internal knowledge that the rumors were unfounded, amplified the damage to Dr. Wegner's reputation.

170.    Defendants damaged Dr. Wegner in the way that his termination was handled and the lack of communication, external and internal transparency, and without adequate or reasonable transition and external communication published defamatory messages to the Memphis and National medical communities, which will have permanent, severe, and devastating professional and financial harms and losses to Dr. Wegner.

171.    As a result, Dr. Wegner has suffered emotional distress, humiliation, and injury to his professional standing in the medical community.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

1. Award damages resulting from Defendants' breach of Dr. Wegner's PEA in an amount not less than $3,700,000.00 to be proven at trial.

2. Award compensatory damages in an amount to be determined at trial in an amount not less than $20,000,000.00;

3. Award punitive damages where authorized in an amount not less than $20,000,000.00;

4. Issue a declaratory judgment finding Defendants violated EMTALA and Tennessee law;

5. Grant preliminary and permanent injunctive relief;

6. Award pre- and post-judgment interest;

7. Award attorneys' fees and costs;

8. Grant all other relief the Court deems just and proper.

Respectfully submitted,

/s Alan G. Crone

Alan G. Crone, Esq. (TN Bar No. 14285)
Crone Law Firm, PLC
88 Union Avenue, Floor 14
Memphis, TN 38103
acrone@cronelawfirmplc.com
(901) 737-7740

s/Clarence Wilbon
Clarence Wilbon (TN Bar No. 23378)
Adams & Reece
6075 Poplar Avenue, Suite 700
Memphis, Tennessee 38119
901.524.5324
Clarence.Wilbon@arlaw.com
*Attorneys for Plaintiff*

**VERIFICATION**

I, Dr. Robert Wegner, declare and swear under oath under penalty of perjury that the

foregoing Complaint is true and correct to the best of my knowledge, information, and belief.

Executed on: April 7, 2025

_____

Robert Wegner, M.D.