## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **ROBERT WEGNER, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 2:25-cv-02389** |
| **TENET PHYSICIAN RESOURCES,** | ) | |
| **ST. FRANCIS PHYSICIAN NETWORK, LLC,** | ) | |
| **ST. FRANCIS HOSPITAL, and** | ) | |
| **TENET HEALTHCARE CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

This case involves the retaliatory actions of Defendants Tenet Physician Resources, St. Francis Hospital, and Tenet Healthcare Corporation (collectively, "Defendants") to wrongfully terminate Plaintiff, Dr. Robert Wegner, and dismantle a nationally accredited bariatric program without a credentialed successor in place. Dr. Wegner seeks emergency injunctive relief to halt unsafe and unlawful clinical practices that have continued since his removal, including the delegation of bariatric post-operative care to unqualified or unsupervised personnel in violation of Tennessee law and medical accreditation standards.

Through his Motion, Dr. Wegner seeks only narrowly tailored relief necessary to protect his patients and preserve the integrity of the program he led for over 15 years. As the only fellowship-trained bariatric surgeon previously credentialed at St. Francis Hospital, Dr. Wegner provided care to thousands of patients who now face uncertainty and risk. He brings this action only after Defendants abruptly terminated him, ignored legal and ethical requirements for

continuity of care, and began implementing a care model that endangers patient safety, violates medical supervision laws, and undermines professional standards.

## INTRODUCTION

Plaintiff Robert Wegner, M.D. seeks a temporary restraining order and preliminary injunction to prevent the continued disruption of patient care, violation of medical supervision laws, and irreparable harm to his livelihood and professional reputation. Dr. Wegner was terminated in retaliation for refusing to perform elective bariatric surgeries without appropriate post-operative care in place, and for insisting that St. Francis Hospital and its administrators comply with accreditation and credentialing standards.

The Defendants—including Tenet Physician Resources (TPR), St. Francis Hospital, Tenet Healthcare Corporation, and their agents—have replaced Dr. Wegner with unqualified personnel, falsely portrayed him as a threat to patient safety, and are actively violating Tennessee's medical supervision laws by allowing a nurse practitioner to treat post-operative patients without oversight by a credentialed bariatric surgeon. Their actions have already endangered patients, caused reputational harm, and placed the hospital's accreditation at risk.

## FACTUAL BACKGROUND

### Dr. Wegner's Role and MBSAQIP Credentialing

Beginning in August 2010, Dr. Wegner, a fellowship-trained bariatric surgeon, served as the sole bariatric surgeon and MBSAQIP Program Director at St. Francis Hospital for over 15 years, earning national recognition for patient outcomes, surgical volume, and professional integrity, until his wrongful termination in breach of contract and in retaliation for engaging in protected activity from February 28, 2025, to March 20, 2025 (Verified Complaint, ¶12).

Over the course of his tenure, Dr. Wegner performed nearly 6,000 bariatric procedures and led the hospital through multiple MBSAQIP accreditations, consistently delivering results that positioned the program among the most reputable in the region (Verified Complaint, ¶13; Exhibit 1, MBSAQIP Standards, p. 7). Both Defendants and Dr. Wegner had ethical and legal duties to provide follow-up care to these patients under medical ethics rules, state law, and federal law (Verified Complaint, ¶14).

In 2024, Defendants promoted Dr. Wegner in a national bariatric campaign that described him as the "gold standard" among Tenet's surgeons (Verified Complaint, ¶15). During MBSAQIP site reviews in August 2024, reviewer Dr. Jay Suggs recommended that St. Francis revise its credentialing policy to require formal bariatric fellowship training—an essential safeguard for continued accreditation and patient safety (Verified Complaint, ¶16; Exhibit 1, MBSAQIP Standards, pp. 5–7).

Dr. Wegner led the creation and approval of this policy, which passed all of the hospital's required internal committees without objection. It was adopted by the Credentials Committee on September 9, the Medical Executive Committee on September 12, and the Governing Board on September 26, 2024, becoming the controlling credentialing standard for bariatric privileges at St. Francis (Verified Complaint, ¶¶17–18; Exhibit 2, SFH Credentialing Policy, p. 2).

The credentialing policy, authored by Dr. Wegner, mandated a completed bariatric fellowship, submission of a case log, and a formal letter of competency, aligning the hospital's requirements with national standards (Verified Complaint, ¶19; Exhibit 2, SFH Credentialing Policy, pp. 1–2). These standards were designed to ensure patient safety and compliance with MBSAQIP (Verified Complaint, ¶20).

Rather than reinforce these safety guardrails, hospital executives began working to circumvent them—viewing the policy not as a framework for high-quality care, but as an impediment to cost-saving personnel changes (Verified Complaint, ¶21).

**Dr. Wegner's Contractual Rights and Obligations**

On or about June 1, 2022, Dr. Wegner and Saint Francis Physician Network, LLC executed a Physician Employment Agreement ("PEA") and a Directorship Agreement ("DA"). These agreements, collectively referred to as the "Wegner Agreements," governed the terms and conditions of Dr. Wegner's employment with Defendants. Dr. Wegner does not possess signed copies, as Defendants never provided them, but he has consistently used and relied on on an unsigned draft of the PEA as reference for his employment terms (Verified Complaint, ¶22).

The PEA was a five-year contract beginning on or about June 1, 2022. At the time of Dr. Wegner's termination in March 2025, the agreement remained in effect and guaranteed his compensation and employment through May 31, 2027 (Verified Complaint, ¶23). The contract required Defendants to consult with Dr. Wegner prior to hiring or engaging another bariatric surgeon in the area, but Dr. Wegner was never consulted about the hiring of Dr. George Woodman, in violation of this express contractual provision (Verified Complaint, ¶24).

The PEA also outlined Dr. Wegner's responsibilities to ensure continuity of care, respond to urgent cases and patient transfers, document clinical care accurately, and comply with applicable credentialing and hospital standards. Dr. Wegner's refusal to perform elective surgeries without credentialed coverage was consistent with these duties (Verified Complaint, ¶25). The agreement affirmed Dr. Wegner's right to exercise independent medical judgment. His decision not to proceed with elective surgeries without credentialed follow-up coverage was a direct and proper exercise of that discretion (Verified Complaint, ¶26).

4

Termination "for cause" under the PEA required written notice of any alleged performance deficiency and at least 30 days to cure, unless the alleged deficiency involved extreme circumstances like loss of licensure or immediate patient harm. No such notice or opportunity to cure was provided prior to Dr. Wegner's termination (Verified Complaint, ¶27). The PEA further emphasized the importance of maintaining hospital credentials and medical staff privileges at St. Francis, both of which Dr. Wegner held without restriction at the time of his removal (Verified Complaint, ¶28).

The PEA also incorporated Tenet's ethics and compliance program, which includes whistleblower protections. Dr. Wegner's refusal to perform surgeries he deemed unsafe, and his efforts to raise concerns about emergency care access, were consistent with these compliance obligations (Verified Complaint, ¶29).

**Contract Pressure and Escalating Retaliation and Intimidation Following Ethical Objections**

Upon information and belief, at some point, Defendants desired to renegotiate the PEA to make the ongoing operation of Dr. Wegner's practice more profitable for themselves (Verified Complaint, ¶30). On December 30, 2024, Defendants convened a meeting including Memphis Market Manager Pat Lloyd and Memphis Market Assistant Leslie Malone, attempting to engage Dr. Wegner in renegotiating his PEA (Verified Complaint, ¶31).

During that meeting, Defendants proposed eliminating Dr. Wegner's base salary and other compensation in favor of a structure entirely based on productivity (Verified Complaint, ¶32). This proposal directly violated the five-year employment agreement, which still had more than 30 months remaining, and amounted to a significant and unjustified demotion for one of the system's most senior and successful surgeons (Verified Complaint, ¶33).

After evaluating the proposal, Dr. Wegner declined to renegotiate. He believed the existing contractual arrangement—effective from June 2022 through June 2027—better served both his interests and the integrity of the program (Verified Complaint, ¶34). Upon being informed of Dr. Wegner's decision, Defendants allegedly began a campaign of threats and pressure to force him to renegotiate or resign, thereby freeing them to make more profitable arrangements with a different physician—an effort that violated the PEA (Verified Complaint, ¶35).

Over the following weeks, Tenet Physician Resources escalated this pressure campaign. They offered even worse terms and threatened to reassign or eliminate Vanessa Williams, Dr. Wegner's trusted nurse practitioner who had worked with him for over a decade, thereby leaving him without professional support (Verified Complaint, ¶36).

On February 28, 2025, Defendants issued Dr. Wegner a 90-day termination notice "without cause," as provided for under the PEA (Verified Complaint, ¶37; Exhibit 3, Notice of Termination). The agreement contains a 90-day notice provision (Verified Complaint, ¶38). Despite the termination, Defendants required Dr. Wegner to continue performing elective bariatric surgeries and providing emergency patient care during the notice period (Verified Complaint, ¶39).

Although he remained committed to patient safety, Dr. Wegner refused to perform elective surgeries during this period, as no credentialed successor or follow-up treatment program was in place. Continuing under such conditions would have violated the hospital's policies, Tennessee medical ethics, and federal and state law. He therefore declined to perform those elective surgeries on ethical and legal grounds (Verified Complaint, ¶40; Exhibit 4, ASMBS Ethics Letter, p. 1).

6

Dr. Wegner's decision was grounded in his extensive professional experience, which confirmed that a predictable percentage of bariatric patients would present to the emergency room after surgery with serious complications (Verified Complaint, ¶41; Exhibit 4, ASMBS Ethics Letter, p. 1). He understood that under federal patient protection laws such as the Emergency Medical Treatment and Labor Act (EMTALA), bariatric patients presenting to the ER post-operatively were entitled to an appropriate medical screening and stabilization—services that often require evaluation by a credentialed bariatric surgeon (Verified Complaint, ¶42; Exhibit 1, MBSAQIP Standards, p. 5).

Because St. Francis had no credentialed backup in place, Dr. Wegner warned hospital leadership that continuing to perform elective surgeries without ensuring appropriate follow-up coverage would violate core ethical and medical guidelines governing emergency care, continuity of care, and specialist availability (Verified Complaint, ¶43; Exhibit 1, MBSAQIP Standards, pp. 5–7). Bariatric surgery patients are a medically vulnerable population who require skilled, long-term follow-up by professionals trained in the nuances of bariatric physiology, complications, and recovery (Verified Complaint, ¶44; Exhibit 4, ASMBS Ethics Letter, p. 1).

Dr. Wegner's position was later supported by the Chair of the Ethics Committee for the American Society for Metabolic and Bariatric Surgery (ASMBS), who stated in a March 31, 2025, letter that Dr. Wegner had appropriately refused to proceed with surgeries when no credentialed coverage was available, in accordance with ASMBS and MBSAQIP ethical and clinical standards (Verified Complaint, ¶45; Exhibit 4, ASMBS Ethics Letter, p. 1).

In response to Dr. Wegner's warnings, TPR formally acknowledged that his concerns about continuity of care were valid (Verified Complaint, ¶46; Exhibit 3, Notice of Termination,

p. 1). Despite this, Pat Lloyd pressured him to proceed with surgeries anyway, texting that the patients had "paid money" (Verified Complaint, ¶47).

Dr. Wegner again refused, citing the applicable MBSAQIP and ASMBS standards. He recommended that the hospital communicate honestly with patients and issue refunds where necessary, rather than resort to deception and unsafe practices (Verified Complaint, ¶48; Exhibit 1, MBSAQIP Standards, pp. 6–7).

Instead of accepting this ethically grounded recommendation, Defendants instructed Dr. Wegner not to communicate with patients and placed office manager Cora Austin in charge of all patient contact—effectively shutting down transparency and leaving patients uninformed about their care and provider status (Verified Complaint, ¶49).

**Sabotage and Misinformation**

On March 3, 2025, Pat Lloyd convened a private meeting of Tenet Physician Resources (TPR) and St. Francis Hospital leadership to discuss the replacement of Dr. Robert Wegner and the reassignment of his staff (Verified Complaint, ¶50). Dr. Wegner was deliberately excluded from this meeting, even though its primary purpose concerned his own termination and replacement (Verified Complaint, ¶51).

Attendees included Pat Lloyd, Chief Strategy Officer Karun Gadiparthi, Nurse Director Amanda Talley, and Bariatric Program Coordinator Leslie Albers, among others (Verified Complaint, ¶52). During the meeting, Karun Gadiparthi stated that she had heard Dr. Wegner's termination was connected to allegations of Medicare fraud, sexual harassment, and an arrest (Verified Complaint, ¶53). Gadiparthi specifically asked whether the rumors were true that Dr. Wegner had committed Medicare fraud or had been arrested—statements that improperly conflated Dr. Wegner with Dr. Sanjeev Kumar, a separate Memphis physician who had in fact

been arrested on or about February 28, 2025, and indicted on March 3, 2025, on 23 federal

charges including healthcare fraud, coercion for sex acts, and misuse of medical devices

(Verified Complaint, ¶54; see also:

https://www.commercialappeal.com/story/news/local/2025/03/03/memphis-doctor-indicted-

sanjeev-kumar/81149858007/, https://www.actionnews5.com/2025/02/28/east-memphis-doctor-

indicted-23-federal-charges-alleging-coercion-sex-acts-misuse-medical-devices-healthcare-

fraud/).

Amanda Talley responded that she had heard the same rumors but did not know whether

they were true (Verified Complaint, ¶55). Pat Lloyd and the other meeting participants failed to

dispute, clarify, or correct these defamatory allegations, even though they knew the statements

were false and damaging to Dr. Wegner (Verified Complaint, ¶56).

No one at the meeting made clear that the individual arrested was Dr. Kumar—not Dr.

Wegner—and the group allowed the defamatory speculation to stand uncorrected (Verified

Complaint, ¶57). Karun Gadiparthi either knowingly or negligently conflated Dr. Kumar's arrest

with Dr. Wegner's absence from work following his February 28 termination (Verified

Complaint, ¶58). Pat Lloyd and the rest of the leadership failed to correct this false association,

thereby allowing the defamatory narrative to persist unchallenged (Verified Complaint, ¶59).

The defamatory speculation was not contained within the March 3 meeting—it was later

"published" externally, extending beyond the defendants' internal organization (Verified

Complaint, ¶60).

On March 3, 2025, Dr. William "Rusty" Vance Shappley III and Dr. David A. Gubin,

both urologists in private practice with The Urology Group, P.C. in Memphis, contacted

Physician Coordinator Jenny Lovitt to inquire about rumors regarding Dr. Wegner's alleged

criminal and professional misconduct (Verified Complaint, ¶61). Neither Dr. Shappley nor Dr.

Gubin were employed by TPR or St. Francis Hospital, and neither had any internal role in Dr.

Wegner's employment—confirming that the defamatory information had been externally

disseminated beyond the defendants' control (Verified Complaint, ¶62).

The spread of these false allegations to Drs. Shappley and Gubin constitutes a publication

of defamatory material to third parties unaffiliated with the defendants (Verified Complaint,

¶63).

In addition to allowing these damaging rumors to spread, leadership moved forward with

finalizing plans to reassign Vanessa Williams to the GI clinic under the supervision of Dr.

Bowden—a gastroenterologist who was not a surgeon, much less a bariatric surgeon (Verified

Complaint, ¶64). They also advanced plans to replace Dr. Wegner with Dr. George Woodman, a

general surgeon who lacked bariatric fellowship training and was ineligible for bariatric

privileges under the newly adopted credentialing policy (Verified Complaint, ¶65; Exhibit 2,

SFH Credentialing Policy, p. 2).

Dr. Wegner was never consulted about Woodman's recruitment, in direct violation of his

employment agreement, which required that he be consulted before hiring another bariatric

surgeon. This occurred despite Dr. Wegner's March 4, 2025 offer to stay on during a transition

period and assist in recruiting and onboarding a credentialed successor (Verified Complaint,

¶66).

On March 17, 2025, Pat Lloyd informed Dr. Wegner via email that Dr. Woodman would

be taking over the program (Verified Complaint, ¶67). At a meeting on March 18, Dr. Wegner

objected to this decision, pointing to the credentialing policy and asking how Woodman met the

necessary criteria (Verified Complaint, ¶68). Lloyd and Malone provided no explanation and made no attempt to address Dr. Wegner's objections (Verified Complaint, ¶69).

That same day, Dr. Wegner sent a written follow-up reiterating his objection to Woodman's appointment (Verified Complaint, ¶70).

Dr. Wegner's offers, objections, and proposed solutions were entirely ignored. No investigation was initiated, and no credentialing review of Dr. Woodman was conducted before moving forward (Verified Complaint, ¶71).

Just two days later, on March 20, 2025, TPR issued a new termination letter to Dr. Wegner. This letter retroactively withdrew the "without cause" notice and replaced it with a "for cause" termination under Section 8(a) of the PEA, effective immediately (Verified Complaint, ¶72; Exhibit 3, Notice of Termination, p. 1).

The letter asserted that Dr. Wegner's refusal to proceed with elective surgeries constituted conduct "materially detrimental to the care of your patients," even though no credentialed surgeon was available to assume follow-up care for those patients (Verified Complaint, ¶73; Exhibit 3, Notice of Termination, p. 1). In fact, the same letter acknowledged that Dr. Wegner was the only credentialed bariatric surgeon in the program and that his refusal to proceed was based solely on the lack of coverage—circumstances that were entirely consistent with the hospital's credentialing standards (Verified Complaint, ¶74; Exhibit 3, Notice of Termination, p. 1; Exhibit 2, SFH Credentialing Policy, pp. 1–2).

Following this immediate termination, Dr. Wegner's salary was cut off, his access to the clinic was revoked, and his ability to treat patients or supervise staff—including Vanessa Williams—was eliminated overnight (Verified Complaint, ¶75). The termination was issued

without any prior written notice, without affording Dr. Wegner an opportunity to cure, and in direct violation of the PEA's explicit terms (Verified Complaint, ¶76).

The "Right to Cure" clause in Section 8 of the PEA states:

"**Before proceeding with termination for any alleged performance deficiency—except in extreme cases such as loss of licensure or immediate harm—the employer must deliver written notice of the issue and afford the physician at least thirty days to cure, or longer if reasonably required**" (Verified Complaint, ¶77).

Despite this provision, no such notice was provided. No performance issue was ever documented. There was no patient harm. There were no allegations of clinical misconduct or substandard outcomes. Dr. Wegner was not given any opportunity to correct or respond to any concern before termination (Verified Complaint, ¶78).

By removing the only credentialed bariatric surgeon and replacing him with someone unqualified, St. Francis did not merely ignore its credentialing policy—it effectively dismantled it (Verified Complaint, ¶79; Exhibit 2, SFH Credentialing Policy, p. 2).

On March 4, 2025, Defendants had presented Dr. Wegner with a written plan to implement this new, noncompliant model (Verified Complaint, ¶80).

Dr. Wegner rejected the plan as unethical and again offered to remain during a transition period to help recruit and onboard a qualified, credentialed replacement (Verified Complaint, ¶81). His offer was ignored (Verified Complaint, ¶82). Meanwhile, staff began circulating damaging rumors, and no public correction or clarification was issued to counteract the false narrative (Verified Complaint, ¶83).

On March 17, 2025, Dr. Wegner was informed that Dr. George Woodman would officially be taking over the bariatric program (Verified Complaint, ¶84). Dr. Wegner promptly

objected, reiterating that Dr. Woodman lacked the required fellowship training and therefore did not meet the criteria under the hospital's own credentialing policy (Verified Complaint, ¶85).

MBSAQIP site reviewer Dr. Jay Suggs and the Chair of the ASMBS Ethics Committee both confirmed that the situation was unethical and dangerous. Their professional opinions reinforced that Dr. Wegner's refusal to proceed with elective cases was ethically and medically appropriate under the circumstances (Verified Complaint, ¶86; Exhibit 4, ASMBS Ethics Letter).

On March 20, 2025, TPR issued a formal letter of termination "for cause," alleging falsely that Dr. Wegner's refusal to perform surgeries violated the PEA (Verified Complaint, ¶87; Exhibit 3, Notice of Termination). Notably, the letter did not invoke—or even reference— the "Right to Cure" clause outlined in Section 8 of the PEA (Verified Complaint, ¶88).

That provision expressly requires that, prior to any termination for performance-related concerns—except in extreme cases such as loss of licensure or imminent patient harm—the employer must deliver written notice and afford the physician at least thirty days to cure, or longer if reasonably required (Verified Complaint, ¶89).

This clause was not a formality. It represented a critical contractual safeguard designed to foster communication, enable remediation, and preserve continuity of patient care before resorting to the most extreme action—termination (Verified Complaint, ¶90).

Dr. Wegner was never given that opportunity. No formal notice of deficiency was issued, no discussion was initiated to address any alleged concerns, and no chance was provided to collaborate on a transition plan or propose alternative solutions (Verified Complaint, ¶91). Instead, Defendants escalated abruptly from a "without cause" termination to a "for cause" dismissal—sidestepping their own contractual obligations at the very moment such protections were most needed, in the midst of an ongoing patient care crisis (Verified Complaint, ¶92).

Had Defendants honored their contractual duties under the PEA, Dr. Wegner could have remained temporarily in his role while assisting in the recruitment and onboarding of a qualified, credentialed successor. In fact, Dr. Wegner had verbally proposed this exact solution to Pat Lloyd on March 4, 2025 (Verified Complaint, ¶93).

**Breakdown of Leadership and Patient Risk**

Instead, Defendants stripped Dr. Wegner of his compensation, hospital access, medical staff privileges, malpractice insurance, and the authority to practice medicine at St. Francis Hospital (Verified Complaint, ¶94). At the same time, they ordered Vanessa Williams, Dr. Wegner's nurse practitioner, to continue treating complex post-operative bariatric patients without physician supervision—contrary to Tennessee law and medical ethics (Verified Complaint, ¶95).

On March 24, 2025, St. Francis Emergency Room Director Dr. Michael Washington called Dr. Wegner for guidance, uncertain how to care for patients in the absence of a credentialed bariatric surgeon (Verified Complaint, ¶96). No formal transition plan had been issued to hospital staff (Verified Complaint, ¶97).

Chief Medical Officer Dr. David Schwartz failed to intervene, take action, or respond to the growing concerns about patient care and safety (Verified Complaint, ¶98). He was informed that patients were still awaiting future bariatric procedures but took no steps to ensure continuity of care (Verified Complaint, ¶99). Dr. Schwartz also failed to correct the false rumors circulating about Dr. Wegner and allowed damaging misinformation to persist unchecked (Verified Complaint, ¶100).

14

**Legal Violations and Harm**

The named administrators and hospital leaders either enabled or directly participated in conduct that violated hospital policy, accreditation rules, and state and federal law (Verified Complaint, ¶101). Dr. Wegner's ethical refusal to participate in practices that endangered patient safety and violated legal and professional standards was met with escalating retaliation, culminating in his wrongful termination (Verified Complaint, ¶102).

As a result of these actions, Dr. Wegner has suffered severe and ongoing harm, including damage to his professional reputation, the loss of his income, and the destruction of his ability to continue practicing medicine within his established community (Verified Complaint, ¶103).

**Patient Safety Failures, Unchecked Risk, and Emergent Harm**

Despite repeated warnings and official correspondence—including service of a litigation hold—Defendants failed to clarify Dr. Wegner's termination status, protect patients, or implement a lawful transition plan (Verified Complaint, ¶104). Following his removal, St. Francis Hospital failed to notify its emergency room physicians, hospitalists, bariatric nurse practitioners, or referring providers that the hospital no longer had a credentialed bariatric surgeon on staff (Verified Complaint, ¶105).

This inaction transformed what began as an employment dispute into a broader public health crisis (Verified Complaint, ¶106). As a result, Dr. Wegner continued to receive consult requests and protected health information, despite having no legal authority, clinical privileges, or malpractice coverage following his termination (Verified Complaint, ¶107).

Dr. Wegner is a protected whistleblower under both federal and Tennessee law and has formally notified Defendants of his intent to pursue legal remedies for the retaliatory actions taken against him (Verified Complaint, ¶108).

**Incident on March 31, 2025:**

On the morning of Monday, March 31, 2025, Dr. Wegner received a call from the St. Francis ER secretary requesting a consultation for a former bariatric surgery patient who was presenting with serious post-operative complications (Verified Complaint, ¶109). The patient had been transferred from Baptist Hospital and was diagnosed with a gastric ulcer and possible fluid collection at the surgical site—conditions that could require emergency surgical intervention (Verified Complaint, ¶110).

The consultation had been ordered by Dr. Martin Duclos, the head of the hospitalist group, who was unaware that Dr. Wegner had been terminated and expected him to respond to the case as usual (Verified Complaint, ¶111). Dr. Wegner was placed on the phone with the bedside nurse, who likewise believed he was still on staff and asked him to direct the patient's care (Verified Complaint, ¶112).

At that time, Dr. Wegner no longer held hospital privileges, malpractice coverage, or any legal authority to treat patients, yet was still being contacted for clinical decisions—a situation that created serious patient safety concerns and a potential HIPAA violation (Verified Complaint, ¶113–¶114). In an effort to redirect care appropriately, Dr. Wegner contacted Dr. Alan Hammond, the head of general surgery, and requested that his team evaluate the patient (Verified Complaint, ¶115). However, no consult note was recorded and no evaluation by a surgeon took place (Verified Complaint, ¶116).

On April 1, 2025, the patient was admitted to the medical floor without ever being seen by a credentialed surgeon—despite being a transfer case with known post-operative complications (Verified Complaint, ¶117; Exhibit 1, MBSAQIP Standards, pp. 9–10). Bariatric

16

nurse practitioner Dawn Matz contacted Dr. Wegner again, unaware that he had been

terminated—illustrating the continued communication failure within the hospital (Verified

Complaint, ¶118). When asked who was covering bariatric consults, nurse Matz responded, "No

one, I guess" (Verified Complaint, ¶119).

**Incident of April 4, 2025:**

Later that same week, on the evening of April 4, 2025, the St. Francis Transfer Center

again contacted Dr. Wegner in an attempt to route a bariatric surgery patient to him for care

(Verified Complaint, ¶120).

Dr. Wegner informed the referring provider that he was unavailable to accept the transfer

and instructed them to contact the Transfer Center to identify a surgeon at St. Francis who could

assume care (Verified Complaint, ¶121). Concerned about the patient's safety, Dr. Wegner

proactively followed up the next morning, April 5, 2025, to find out what had happened

(Verified Complaint, ¶122).

The Transfer Center informed him that the patient had indeed been transferred to St.

Francis Hospital on Park. However, the transfer was accepted not by a credentialed bariatric

surgeon, but by Dr. Johnston, an emergency room physician. No surgeon had been consulted

before accepting the patient (Verified Complaint, ¶123).

This confirmed that St. Francis Hospital was knowingly accepting emergency surgical

transfers without having a credentialed bariatric surgeon on staff or on call—and doing so

despite having been expressly warned by Dr. Wegner that he could not legally or ethically accept

such cases. As Dr. Wegner remarked at the time, "I would understand if the patient showed up at

St. Francis on their own—but accepting transfers is a different story." The hospital's actions

showed a reckless disregard for patient safety and violated standard medical protocols (Verified

Complaint, ¶124; Exhibit 1, MBSAQIP Standards, pp. 5–6; Exhibit 2, SFH Credentialing Policy,

p. 2).

**Organizational Negligence and Abandonment**

Under the MBSAQIP Accreditation Standards, hospitals are required to have the

capability to recognize and treat complications related to metabolic and bariatric surgery. The

standards make clear that written transfer agreements cannot substitute for having credentialed

surgical care available on site (Verified Complaint, ¶125).

Chief Medical Officer Dr. David Schwartz was aware that bariatric patients remained in

need of follow-up procedures after Dr. Wegner's termination, yet he failed to take any action

(Verified Complaint, ¶126). No formal announcement was made to inform hospital staff or

referring physicians that there was no longer a credentialed bariatric surgeon available, and no

appropriate replacement with the required credentials was put in place (Verified Complaint,

¶127; Exhibit 2, SFH Credentialing Policy, p. 2; Exhibit 1, MBSAQIP Standards, pp. 7–9).

At present, patients with complex surgical complications continue to be admitted to St.

Francis Hospital without any credentialed bariatric surgeon on call, no clinical supervision, and

no established transition-of-care protocol in place (Verified Complaint, ¶128). According to

MBSAQIP standards, if a center lacks the ability to manage the full scope of bariatric

complications, it must have a signed, written transfer agreement with a facility that can provide

comprehensive bariatric care. At the time of Dr. Wegner's termination, St. Francis had neither a

credentialed bariatric surgeon nor any such transfer agreements in place (Verified Complaint,

¶129).

The emergency department, hospitalist group, bariatric nurse practitioners, and general

surgery teams at St. Francis are operating in a state of total misinformation and organizational

failure (Verified Complaint, ¶130). Despite this, the hospital has continued to accept emergency

bariatric patient transfers—including the April 4–5, 2025 case—without proper surgical

consultation. These actions violated MBSAQIP standards, placed patients at serious risk, and

confirmed Dr. Wegner's warnings that continuing to accept such cases without credentialed

coverage created a noncompliant and dangerous environment (Verified Complaint, ¶131; Exhibit

1, MBSAQIP Standards, pp. 5–6).

Dr. Wegner, despite being stripped of his title, access, authority, and legal protections,

has remained the only medical professional actively attempting to redirect care and protect

patients (Verified Complaint, ¶132).

**Professional Destruction and Reputational Harm**

Dr. Wegner's abrupt termination and the hospital's silence left patients confused and

without continuity of care. Many were unaware their surgeon had been removed and presented to

the ER in distress, expecting to be seen by Dr. Wegner (Verified Complaint, ¶133). In addition,

TPR enforced a non-compete clause that barred Dr. Wegner from practicing within a 30-mile

radius, effectively cutting him off from his patient population, income, and the referral network

he had spent more than 15 years building. The result has been professional exile from the very

community he served (Verified Complaint, ¶134).

Simultaneously, defamatory rumors were allowed to circulate within the hospital—

alleging that Dr. Wegner had committed Medicare fraud or had even been arrested. No

corrections or clarifications were issued. Combined with the silence surrounding his removal,

these rumors gave rise to the false impression that Dr. Wegner had acted unethically or

abandoned his professional responsibilities (Verified Complaint, ¶135).

19

Referring providers, unaware of the facts or Dr. Wegner's ethical reasoning, stopped

sending him patients. His carefully cultivated referral base, developed over nearly two decades,

collapsed in a matter of weeks. The reputational damage was swift, far-reaching, and irreversible

(Verified Complaint, ¶136).

Although Dr. Wegner received formal written support from national leaders—including

Dr. John Baker, Chair of the ASMBS Ethics Committee—affirming that his refusal to operate

without appropriate follow-up coverage was ethically required, this validation has not reversed

the local reputational harm caused by Defendants (Verified Complaint, ¶137; Exhibit 4, ASMBS

Ethics Letter, p. 1). MBSAQIP site reviewer Dr. Jay Suggs similarly confirmed that the

credentialing policy authored by Dr. Wegner was appropriate and that pausing elective surgeries

until a credentialed replacement was secured was the correct professional response (Verified

Complaint, ¶138; Exhibit 1, MBSAQIP Standards, pp. 5–7).

Despite this national-level validation, Dr. Wegner remains professionally isolated,
emotionally distressed, and unable to resume his surgical practice. The harm to his career,
reputation, and mental health continues to this day. His losses go beyond financial
compensation—they include his standing in the medical community and the ability to serve the
patients who trusted him. These are injuries that cannot be undone by money alone (Verified
Complaint, ¶139).

## **ARGUMENT**

To obtain injunctive relief, Plaintiff must show: (1) a substantial likelihood of success on

the merits; (2) irreparable harm if relief is denied; (3) that the balance of equities favors the

Plaintiff; and (4) that the injunction would serve the public interest. See *Winter v. Nat. Res. Def.*

*Council,* Inc., 555 U.S. 7, 20 (2008); *Certified Restoration Dry Cleaning Network, LLC v. Tenke*

*Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

## I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

Dr. Wegner asserts multiple legal claims, each supported by a detailed factual record and well-established statutory protections. His claims are rooted in his efforts to uphold patient safety, medical ethics, and hospital accreditation standards in the face of administrative pressure to compromise them. The sequence of retaliatory actions taken by Defendants in response provides ample grounds for this Court to find a substantial likelihood of success on the merits.

First, Dr. Wegner brings a claim for whistleblower retaliation under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd(i). EMTALA expressly prohibits hospitals from penalizing or taking adverse action against physicians who refuse to participate in practices that violate its patient protection mandates. Defendants attempted to pressure Dr. Wegner into performing elective bariatric surgeries without adequate assurance of post-operative care—a clear violation of EMTALA's requirement that patients receive appropriate follow-up treatment. Dr. Wegner refused to comply with these unlawful directives and was promptly subjected to escalating retaliation, culminating in his termination. As the court explained in *Fotia v. Palmetto Behavioral Health*, 317 F. Supp. 2d 638, 643 (D.S.C. 2004):

> "Section 1395dd(d)(2)(A) creates an explicit right of action for harmed individuals, and § 1395dd(i) establishes that whistleblowers are not to be 'penalized' or subjected to 'adverse action.' Thus, **as a whistleblower alleging retaliation**, the very gravamen of Plaintiff's complaint is that he has been harmed by a violation of EMTALA. Under the plain language of § 1395dd(i), **Plaintiff should therefore have a right of action**." (emphasis added).

That holding applies with full force in this case. Dr. Wegner correctly objected to performing elective bariatric surgeries under conditions that failed to meet the ethical obligations outlined in the ASMBS Code of Ethics and MBSAQIP accreditation requirements. He

21

specifically refused to proceed with surgeries unless continuity-of-care was ensured through a

credentialed, fellowship-trained successor. His actions were consistent not only with federal law

but also with best practices in patient safety and professional ethics—further underscoring the

legitimacy and legal protection of his refusal.

      These objections were not only reasonable—they were legally protected. Following his

refusal, Defendants escalated his termination from a 90-day no-cause exit under Section 8(c) of

his contract to an immediate "for cause" dismissal under Section 8(a), cutting off his access,

salary, and patient relationships. This sequence closely mirrors recognized patterns of retaliatory

discharge under federal whistleblower statutes. Moreover, Dr. Wegner raised his concerns

directly with hospital leadership and obtained external confirmation from both the MBSAQIP

site reviewer and the ASMBS Ethics Committee, both of whom validated his professional

judgment.

      Second, Dr. Wegner states a claim for breach of contract. His employment agreement

with Tenet Physician Resources was a five-year contract that included explicit protections for his

compensation structure, consultation in the hiring of additional bariatric surgeons, and autonomy

over clinical decision-making. TPR unilaterally attempted to modify his compensation to a pure

productivity model, eliminated essential support staff, and ultimately removed him without

complying with the agreement's terms. The abrupt escalation from a without-cause to a with-

cause termination further violated procedural safeguards and undermined the contract's intended

notice-and-transition provisions.

      Third, Dr. Wegner brings a claim under the Tennessee Public Protection Act (TPPA),

which protects employees who refuse to remain silent about or participate in activities that

violate public policy. Tenn. Code Ann. § 50-1-304. Dr. Wegner's refusal to perform surgeries

without proper post-operative care aligns directly with Tennessee's public policy interests in safeguarding patients and ensuring ethical medical conduct.

Fourth, Dr. Wegner asserts a claim for tortious interference with business expectancy. Following his termination, Defendants barred him from contacting patients, blocked his access to medical records, and replaced him with unqualified providers. These actions intentionally disrupted ongoing physician-patient relationships, a recognized business interest under Tennessee law.

Fifth, Dr. Wegner asserts a claim for defamation. Senior leadership at St. Francis—including Amanda Talley and Karun Gadiparthi—knowingly repeated and failed to correct false rumors alleging that Dr. Wegner had been arrested or committed Medicare fraud. These defamatory statements circulated widely among staff and caused serious reputational harm.

Finally, Defendants have violated Tennessee Code § 63-7-123, which governs nurse practitioner supervision. Nurse Practitioner Vanessa Williams, who had long worked under Dr. Wegner's supervision, was reassigned to continue managing post-operative care without oversight from a qualified bariatric surgeon. This arrangement violates state law and poses an ongoing risk to patient safety.

Taken together, these facts and legal theories demonstrate not only that Dr. Wegner is likely to prevail on the merits, but also that Defendants' conduct was deliberate, retaliatory, and in direct conflict with both the law and fundamental principles of medical care.

## II. AN INJUNCTION SERVES THE PUBLIC INTEREST AND PROTECTS PUBLIC HEALTH, AND THE PUBLIC WOULD OTHERWISE SUFFER IRREPARABLE HARM

The public has a strong interest in maintaining ethical and credentialed surgical practices, especially in bariatric surgery, where long-term post-operative care is essential. The MBSAQIP

standards are not discretionary—they are intended to prevent patient harm and promote surgical

accountability.

### A.  Patient Care and Safety Risks

The harm to patients is severe. Following Dr. Wegner's termination, Saint Francis

Hospital failed to notify patients, staff, or referring providers that the facility no longer had a

credentialed bariatric surgeon on staff. Multiple patients continued to present to the ER expecting

care from Dr. Wegner — and, in several cases, were seen without any credentialed surgical

evaluation (Verified Complaint, ¶109-124).

Continuity of care is especially critical in bariatric surgery. Peer-reviewed studies show

that routine, long-term follow-up significantly improves weight loss outcomes and helps prevent

complications such as leaks, obstructions, and nutritional deficiencies. One study published in

Surgery for Obesity and Related Diseases found that structured follow-up was associated with

better weight maintenance and lower rates of reoperation or complications (Postoperative follow-

up after bariatric surgery: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7045271/).

Despite this, patients were managed by nurse practitioners without appropriate physician

supervision — a violation of Tennessee law and accepted clinical norms (Verified Complaint,

¶95, 130). No successor was credentialed, no transfer agreements were signed, and no transition

plan was communicated internally. The failure to onboard a replacement physician or publicly

announce Dr. Wegner's departure left patients vulnerable and medical teams unprepared

(Verified Complaint, ¶130-132).

In at least two cases (March 31 and April 5), bariatric patients were transferred or

admitted without ever being seen by a credentialed surgeon — in direct violation of MBSAQIP

standards and the hospital's own policy (Exhibit 1, MBSAQIP Standards, pp. 5–6; Exhibit 2,

SFH Credentialing Policy, p. 2; Verified Complaint, ¶109-124). As Gastroenterology &

Endoscopy News reports, "[bariatric] patients are prone to specific complications that general

surgeons may not be equipped to manage," underscoring the need for specialized coverage (The

Post-Bariatric Patient With Complications: https://www.gastroendonews.com/In-the-

News/Article/05-21/The-Post-Bariatric-Patient-With-Complications/63430).

This is precisely the type of public interest the federal court protected in *Stein v. Lee Eye*

*Center, Inc*., 2:21-cv-01730, 2021 WL 5770212 (W.D. Pa. Dec. 6, 2021), where it noted that

"The public has a strong interest in having timely access to medical care of the sort provided by

Dr. Stein. Indeed, taking Dr. Stein's evidence and Defendants' evidence together, it appears to

the Court that Dr. Stein is one of at most a handful of ophthalmologists serving the Mercer

County area. Thus, the Court concludes that it is in the public's interest to have Dr. Stein

available to provide needed eye care to the residents of Mercer County." *Id*. at 4. The *Stein*

court granted injunctive relief, emphasizing that the public interest was served by preventing

disruption to patient care and allowing continued access to a trusted physician during the

pendency of the case.

The same is true here. Dr. Wegner served as the medical director of one of the most

active bariatric programs in the United States, performing thousands of surgeries since 2010 and

addressing a significant gap in bariatric care in Shelby County—a region with high obesity rates

and relatively few fellowship-trained bariatric surgeons. See Brakefield WS, Olusanya OA,

Shaban-Nejad A. *Association Between Neighborhood Factors and Adult Obesity in Shelby*

*County, Tennessee: Geospatial Machine Learning Approach*. JMIR Public Health Surveill. 2022

Aug 9;8(8):e37039. doi: 10.2196/37039. PMID: 35943795; PMCID: PMC9399828

(https://pmc.ncbi.nlm.nih.gov/articles/PMC9399828/). As the Memphis Business Journal

reported, Dr. Wegner's work at Saint Francis "ranked among the top 10% of surgical weight loss programs nationwide," highlighting his critical role in serving the local population (https://www.bizjournals.com/memphis/news/2020/01/07/saint-francis-surgical-weight-loss-program-one-of.html).The relief sought by Dr. Wegner would prevent unsupervised care, protect patients, and restore compliance with medical law and hospital policy.

### III. PLAINTIFF WILL SUFFER IRREPARABLE HARM

Dr. Wegner has suffered and will continue to suffer serious harm, including damage to his professional reputation, interference with patient care relationships, emotional distress, and violation of his ethical obligations.

### A.  Professional and Reputational Harm to Dr. Wegner

Dr. Wegner's abrupt dismissal immediately halted his surgical practice, severing ties with a patient base he had served for over 15 years. His financial losses were compounded by the enforcement of a non-compete clause, which prevented him from continuing to practice within a 30-mile radius. Such clauses are increasingly criticized for restricting physician mobility and limiting patient access to care — especially in underserved areas. According to the American Medical Association (AMA backs effort to ban many physician noncompete clauses: https://www.ama-assn.org/medical-residents/transition-resident-attending/ama-backs-effort-ban-many-physician-noncompete), 37% to 45% of physicians are subject to non-competes, and the AMA has formally supported efforts to ban them in most settings.

On top of these contractual constraints, false and defamatory rumors — including baseless claims of Medicare fraud and criminal conduct — were allowed to circulate within the hospital without correction. This led to a sudden collapse of Dr. Wegner's referral network, which he had built over nearly two decades. The unchecked spread of such falsehoods can be

26

particularly damaging in the medical field, as it undermines trust and causes irreparable reputational harm. As noted by Kennedys Law (Protecting doctors from online trolls and other reputational risks: https://kennedyslaw.com/en/thought-leadership/article/protecting-doctors-from-online-trolls-and-other-reputational-risks/), physicians are increasingly vulnerable to reputational attacks that are difficult to reverse.

Despite validation from national experts—such as ASMBS Ethics Chair Dr. John Baker and MBSAQIP site reviewer Dr. Jay Suggs—Dr. Wegner remains professionally isolated, barred from practicing, emotionally distressed, and unable to resume his career without judicial relief (Exhibit 4, ASMBS Ethics Letter, p. 1; Exhibit 1, MBSAQIP Standards, pp. 5–7; Verified Complaint, ¶138-139).

In addition to reputational and economic harm, Dr. Wegner was denied basic contractual protections. The "for cause" termination was issued without the written notice or 30-day opportunity to cure required by Section 8 of his Physician Employment Agreement — a violation of both the agreement and the implied duty of good faith and fair dealing (Verified Complaint, ¶72-78). No concerns were raised, no performance issues documented, and no remediation was offered.

### B. Courts Consistently Hold That Harm to Reputation and the Inability to Practice One's Profession Constitute Irreparable Harm

It is well established that damage to professional reputation and interference with the ability to practice one's profession support a finding of irreparable harm warranting injunctive relief.

In *Doe v. Community Medical Center, Inc*., No. 9:20-cv-81344, 2020 WL 4745105 (S.D. Fla. Aug. 10, 2020), the court enjoined a hospital's suspension of a physician's privileges, holding that "a loss of professional standing or damage to reputation, particularly when it affects

27

a physician's ability to practice medicine, can constitute irreparable harm." The court

emphasized that such damage cannot be undone by monetary relief alone, especially when it

impairs future employability or the ability to obtain medical privileges elsewhere.

Likewise, in *Wrensford v. Virgin Islands Government Hospital and Health Facilities

Corp.*, No. SX-13-CV-620 (V.I. Super. Ct. 2013), the court found irreparable harm where the

hospital suspended a physician's privileges without due process. It held that "the inability to

practice one's profession, especially when accompanied by damage to one's professional

reputation, constitutes irreparable harm," noting that reinstatement after the fact could not fully

repair the injury suffered.

The Arkansas Supreme Court reached the same conclusion in *Baptist Health v. Murphy*,

365 Ark. 115, 226 S.W.3d 800 (2006), upholding a preliminary injunction against enforcement

of an economic credentialing policy that would have excluded physicians from hospital practice

based on affiliation with a competing facility. The court determined that the resulting disruption

of physician-patient relationships and referral patterns constituted irreparable harm, as the

inability to practice at a given hospital and the erosion of professional networks could not be

remedied by damages.

Most recently, the federal court in *Stein v. Lee Eye Center, Inc.,* 2:21-cv-01730, 2021 WL

5770212 (W.D. Pa. Dec. 6, 2021), reinforced this principle. The court granted a temporary

restraining order barring enforcement of a non-compete against a physician, finding that the

physician "stands to suffer loss to his reputation, patient good will, and standing in the

community—all of which he has worked to develop over 25 years of practicing medicine in

Mercer County." The court emphasized that even if the losses were compensable in theory, the

harm to professional identity, reputation, and patient access rendered the injury irreparable for purposes of injunctive relief.

These cases confirm that where professional standing and the right to work are threatened—particularly in the highly regulated field of medicine—courts routinely find irreparable harm. That standard is met here. Dr. Wegner's removal from practice has not only disrupted his career and referral base, but has also inflicted ongoing reputational harm and legal exposure, the effects of which monetary damages cannot adequately address. Accordingly, injunctive relief is both necessary and appropriate.

## IV. THE BALANCE OF EQUITIES FAVORS PLAINTIFF

The requested relief does not burden Defendants. Dr. Wegner seeks only to protect his reputation, prevent unauthorized and dangerous care, and preserve patients' rights to continuity of care. Defendants have no lawful interest in continuing practices that violate credentialing standards or supervision laws, and in fact massively endangers the public in doing so.

By continuing to accept emergency transfers and bariatric surgery patients without a credentialed bariatric surgeon or valid transfer agreement, Saint Francis Hospital has created serious exposure under the Emergency Medical Treatment and Labor Act (EMTALA). EMTALA requires hospitals to provide appropriate screening and stabilization for emergency conditions, which in the bariatric context often means evaluation by a credentialed specialist — not a generalist or ER physician (Verified Complaint, ¶131; Exhibit 1, MBSAQIP Standards, pp. 5–6).

Moreover, under MBSAQIP accreditation requirements, a center must demonstrate that it can provide full-spectrum bariatric care or have a formal agreement in place to transfer patients to an appropriate facility. Written agreements cannot be substituted with informal arrangements.

As stated by the American College of Surgeons (Metabolic and Bariatric Surgery Accreditation and Quality Improvement Program: https://www.facs.org/quality-programs/accreditation-and-verification/metabolic-and-bariatric-surgery-accreditation-and-quality-improvement-program/):

> **"A center must demonstrate the ability to manage the full spectrum of bariatric complications or have a formal agreement to transfer patients to a facility that can provide definitive care."**

Saint Francis has neither. It continues to accept patients, compounding its exposure to decertification, regulatory penalties, and medical malpractice liability (Verified Complaint, ¶128-131).

Meanwhile, Dr. Wegner — who no longer has hospital privileges or malpractice coverage — continued receiving protected health information (PHI) and consult requests. Despite his repeated attempts to redirect care, the hospital failed to stop staff from contacting him. This placed Dr. Wegner at risk of violating HIPAA and medical licensing standards — all while he lacked any legal authority to intervene (Verified Complaint, ¶111-115).

### V. PRE-FILING NOTICE REQUIREMENTS HAVE BEEN FULFILLED, WITHOUT RESPONSE FROM DEFENDANT

Before seeking emergency injunctive relief, a party must ordinarily make reasonable efforts to notify the opposing party and provide an opportunity to respond. Courts in the Western District of Tennessee have held that a movant satisfies this duty where they "clearly communicated the underlying dispute, the requested relief, and an imminent intention to seek judicial intervention if no resolution is reached." *Hodge v. Paragon Bank*, No. 2:22-cv-02191-JPM-tmp, 2022 WL 899533, at *5 (W.D. Tenn. Mar. 28, 2022).

Here, Dr. Wegner's counsel satisfied—and indeed exceeded—this standard. On March 25, 2025, counsel served a detailed demand letter on Tenet and TPR, outlining the facts, legal claims, and required corrective measures, including reinstatement and credentialing compliance

30

(see *Wegner Demand Letter*, March 25, 2025). The letter expressly warned that litigation would follow if the matter was not resolved promptly.

When the violations continued unabated and patient safety deteriorated further, counsel followed up with a Second Notice and Final Demand for Emergency Corrective Action on April 1, 2025, specifically warning that unless emergency relief was provided by 5:00 PM CST on April 2, Dr. Wegner would file for a Temporary Restraining Order and Preliminary Injunction in federal court "on the morning of Friday, April 4" (*Second Notice and Final Demand*, April 1, 2025, p. 3).

This notice was served both via certified mail and emai**l**, in full compliance with the standards articulated in *Hodge*, where the court found sufficient notice had been provided where counsel's communications were clear, specific, and documented. See *Hodge*, 2022 WL 899533, at *5.

Accordingly, Dr. Wegner's pre-suit efforts met all applicable requirements and afforded the opposing party an opportunity to respond and avoid judicial intervention. The record of documented correspondence and express warnings prior to filing independently supports the propriety of the TRO request.

## **REQUESTED RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a Temporary Restraining Order and Preliminary Injunction requiring Defendants to:

1. Halt all elective and transferred bariatric cases until a credentialed, fellowship-trained bariatric surgeon is in place;

2. Cease all post-operative care by unsupervised or unqualified personnel, including nurse practitioners operating without lawful physician oversight;

3. Issue a formal, institution-wide communication clarifying that Dr. Wegner is no longer practicing at St. Francis and must not be consulted under any circumstances;

4. Develop and disclose a transition-of-care plan, including the current supervising physician responsible for all bariatric patients;

5. Acknowledge and confirm compliance with the March 25 litigation hold notice.

Respectfully submitted,


/s *Alan G. Crone*

Alan G. Crone, Esq.

Crone Law Firm, PLC
88 Union Avenue, Floor 14
Memphis, TN 38103
acrone@cronelawfirmplc.com
(901) 737-7740
*Attorney for Plaintiff*