IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| ROBERT WEGNER, M.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:25-cv-02389-SHL-atc |
| ) | |
| TENET PHYSICIAN RESOURCES, ) | |
| ST. FRANCIS PHYSICIAN NETWORK, ) | |
| LLC, ST. FRANCIS HOSPITAL, and ) | |
| TENET HEALTHCARE CORPORATION, ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND DENYING MOTION TO DISMISS**

Before the Court is Defendants Tenet Physician Resources, St. Francis Physician Network, LLC, St. Francis Hospital, and Tenet Healthcare Corporation's Motion to Compel Arbitration and to Dismiss Plaintiff's Claims Against Defendants, filed April 11, 2025. (ECF No. 8.) In his April 25, 2025 response, Plaintiff Robert Wegner, M.D., asserts that only one of his claims against a single Defendant is subject to the arbitration agreement he entered into, thus necessitating denial of the Motion. (ECF No. 22.) Defendants replied on May 12, 2025. (ECF No. 29.) For the reasons that follow, the motion to compel arbitration is **GRANTED**. Defendants' Motion to Dismiss is **DENIED** and the matter will be **STAYED** pending arbitration.

**BACKGROUND**

On April 7, 2025, Wegner filed a Complaint alleging that he was improperly terminated from his roles as the Program Director of the Metabolic and Bariatric Surgery Accreditation and Quality Improvement Program ("MBSAQIP") at St. Francis Hospital, and as its only

credentialed bariatric surgeon.  According to the Complaint, Wegner served as the MBSAQIP Program Director at St. Francis from August 2010 until he was wrongfully terminated in early 2025.  (ECF No. 1 at PageID 2–3.)  Before his termination, Wegner performed nearly 6,000 bariatric procedures, and led the creation of a credentialing standard for bariatric privileges that St. Francis adopted in September 2024.  (Id. at PageID 3.)  Wegner asserts that this new policy "mandated a completed bariatric fellowship, submission of a case log, and a formal letter of competency, aligning the hospital's requirements with national standards."  (Id. at PageID 4.)

In June 2022, Wegner and St. Francis Physician Network, LLC, executed a five-year Physician Employment Agreement ("PEA") and Directorship Agreement, which govern the terms of Wegner's employment.  (Id.)  Wegner alleges that, "at some point Defendants desired to renegotiate the PEA to make the ongoing operation of [his] practice to be more profitable for Defendants," and proposed eliminating his base salary and other compensation and tying his compensation solely to his productivity.  (Id. at PageID 5–6.)  Wegner declined the request to renegotiate his contract.  (Id. at PageID 6.)  According to Wegner, following his refusal to renegotiate the PEA, Defendants "began a campaign of threats and pressure designed to force him back to the negotiating table or force him to resign so Defendants could make more profitable arrangements with another physician."  (Id.)

Ultimately, on February 28, 2025, Defendants provided Wegner with a written notice of its intent to terminate the PEA without cause, giving him the requisite ninety-day notice.  (Id. at PageID 7; ECF No. 1-8 at PageID 137.)  When Defendants informed Wegner that he was going to be replaced by Dr. George Woodman, Wegner objected based on the fact that Woodman did not meet the fellowship training requirements under St. Francis' credentialing policy.  (ECF No. 1 at PageID 11.)  On March 20, Defendants issued a new termination letter to Wegner, making

his termination "for cause" and immediate.  (Id.)  Wegner was terminated on March 20, 2025.  (Id.)

Wegner filed his lawsuit on April 7, 2025, alleging five counts: retaliation under EMTALA; breach of contract; violation of the Tennessee Public Protection Act ("TPPA"); tortious interference with business expectancy; and defamation.  (Id. at PageID 20–24.)[1]  Those claims, according to Defendants, should be dismissed and the matter referred to arbitration, consistent with the PEA's arbitration provision ("Arbitration Provision"), which provides:

> **ARBITRATION**. Excluding any action for injunctive relief only, any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by arbitration in Shelby County, in State, in accordance with the Tenet's Fair Treatment Process ("FTP"), a comprehensive method for affording fair procedure and resolving employment-related disputes, as detailed in Tenet's Human Resources Policy and Procedures manual Policy No. HR.ERW.05, and applying the laws of the State. . . . **Physician further acknowledges receipt of documentation regarding the Open Door Policy and Fair Treatment Process, including the arbitration process, prior to executing this Agreement.** . . . Arbitration under the Fair Treatment Process is limited to individual disputes, claims or controversies a court of law would be authorized or have jurisdiction over to grant relief, and by agreeing to the use of arbitration to resolve disputes, the parties agree to forego any right to a jury trial on issues covered by the Fair Treatment Process. . . . Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereof may be entered in any court having jurisdiction thereof.

(ECF No. 8-2 at PageID 172.)  The FTP referenced in the Arbitration Provision

---

[1] On April 11, 2025—the same day Defendants filed their Motion to Compel Arbitration—Wegner filed an Application and Motion for Temporary Restraining Order and Preliminary Injunction.  (ECF No. 10.)  On May 5, 2025, the Court entered an Order denying Wegner's Application and Motion for Temporary Restraining Order and Preliminary Injunction, based on the fact that Wegner lacked both Article III and prudential standing to bring his claims for extraordinary relief.  (ECF No. 28.)  On the same day of the entry of this Order, the Court entered an Order Denying Plaintiff Robert Wegner, M.D.'s Motion for Reconsideration of that Order.  (ECF No. 35.)

> applies to Tenet Healthcare Corporation and its subsidiaries and affiliates other than Conifer Holdings Inc. and its direct and indirect subsidiaries (each, an "Affiliate"), any other entity or organization in which Tenet or an Affiliate owns a direct or indirect equity interest of greater than 50%, and any entity in which an Affiliate either manages or controls the day-to-day operations of the entity (each, a "Tenet Entity") (collectively, "Tenet").

(ECF No. 8-3 at PageID 187.) The FTP further provides that it

> applies to all employees, regardless of length of service or status, and the agreement to arbitrate covers all disputes relating to or arising out of an employee's employment with the Company or the termination of employment. . . . Examples of the types of disputes or claims covered by the FTP and the arbitration agreement include, but are not limited to, claims for wrongful termination of employment, breach of contract, . . . tort claims or any other legal claims and causes of action recognized by local, state or federal law of regulations. This is a mutual agreement to arbitrate claims which means that both the employee and the Company are bound to use the FTP process as the only means of resolving employment-related disputes, and thereby agree to forego any right they each may have had to a jury trial on issues covered by the FTP.

(Id. at PageID 188.) Elsewhere, the FTP explains that the term "Company" encompasses Tenet, "its consolidated subsidiaries, hospitals, healthcare operations and other entities owned or operated by the Company's consolidated subsidiaries." (Id. at PageID 187.) Ultimately, Defendants argue that Wegner's claims "fall squarely within the scope of the Arbitration Agreement and the FTP," such that Wegner is bound to arbitrate those claims. (ECF No. 8-1 at PageID 158.)

Wegner counters that the Motion should be denied, as Defendants "seek to force arbitration of matters clearly within this Court's purview." (ECF No. 22 at PageID 446.) Wegner does not dispute that he entered into an arbitration agreement with St. Francis Physician Network, but argues "that agreement is expressly limited to the parties who signed it and contains no language extending its reach to Tenet Physician Resources, Tenet Healthcare

4

Corporation, or St. Francis Hospital," therefore, claims against those Defendants are not subject to the PEA's arbitration provision. (Id. at PageID 447.) Wegner asserts that the FTP is not a signed bilateral agreement, therefore it cannot serve as an independent source of contractual obligations between him and Defendants. (Id. at PageID 450.) Wegner argues that, at bottom, although his breach of contract claim against St. Francis Physician Network is subject to arbitration, none of his other claims, including his claims under EMTALA, under the TPPA, for tortious interference with business expectancy, and for defamation, are not subject to arbitration against any Defendant.[2]

## APPLICABLE LAW

The Federal Arbitration Act ("FAA") "establishes 'a liberal federal policy favoring arbitration agreements.'" Epic Sys. Corp. v. Lewis, 584 U.S. 497, 505–06 (2018) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, (1983)). "The FAA was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation." Stout v. J.D. Byrider, 228 F.3d 709, 714 (6th Cir. 2000) (citations omitted). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 91 (2000).

Under the FAA, arbitration clauses are as "valid, irrevocable, and enforceable" as any other contractual obligation. 9 U.S.C. § 2. With few exceptions, the FAA applies to employment contracts. See Cir. City Stores, Inc. v. Adams, 532 U.S. 105, 113 (2001).

---

[2] Wegner correctly asserts that the Arbitration Clause expressly carves out claims for injunctive relief. (See ECF No. 8-2 at PageID 172.) However, as noted above, the Court previously determined that Wegner did not have standing to bring those claims. (See supra p. 3 n.1.)

Nevertheless, "[i]n general, arbitration is a 'matter of consent,' and 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Mounts v. Midland Funding LLC, 257 F. Supp. 3d 930, 940 (E.D. Tenn. 2017) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989)). So, "[d]espite the liberal federal policy favoring arbitration agreements, such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract." Id. (citation omitted).

When considering whether to compel arbitration, a court has four tasks. It must: (1) determine whether the parties agreed to arbitrate; (2) determine the scope of that agreement; (3) if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration. Stout, 228 F.3d at 714.

Ultimately, courts are to examine the language of the contract in light of the strong federal policy in favor of arbitration, construe any ambiguities in the contract or doubts as to the parties' intentions in favor of arbitration. Id. (citations omitted). "Because arbitration agreements are fundamentally contracts, [courts] review the enforceability of an arbitration agreement according to the applicable state law of contract formation." Seawright v. Am. Gen. Fin. Servs., Inc., 507 F.3d 967, 972 (6th Cir. 2007) (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943–44 (1995)).

## ANALYSIS

Wegner insists that "[t]he threshold issue before this Court is not whether Dr. Wegner's claims fall within the scope of an arbitration agreement, but whether such an agreement ever

6

existed with the Defendants now seeking to enforce it." (ECF No. 22 at PageID 447.)  In short, Wegner asserts that the Arbitration Provision he agreed to is applicable only to St. Francis Physician Network, and not to Tenet Physician Resources, St. Francis Hospital, and Tenet Healthcare Corporation.  Wegner insists that, not only are those entities not signatories to the PEA, but also that the FTP cannot function to bootstrap them into the PEA's Arbitration Provision.  (Id.)

Beyond challenging the arbitration agreement's applicability to Defendants other than St. Francis Physician Network, Wegner also challenges the agreement's scope.  He asserts that, other than his breach of contract claim, none of the causes of action in his complaint fall within the bounds of the agreement.  (Id. at PageID 452.)  As explained below, the Court concludes that neither argument carries the day, so that the Arbitration Provision must be enforced.

A. The Non-St. Francis Physician Network Entities Are Covered by the Arbitration Agreement

The threshold question to be answered is which entities are subject to the PEA's Arbitration Provision.  According to Defendants, each named Defendant is a wholly-owned subsidiary of Tenet Health Care Corporation.  This assertion, which Plaintiff does not contest, is supported by the Declaration of Tina Ruth, the Director of Human Resources for Tenet Health, which is attached to Defendants' reply. (ECF No. 29-1.)  Defendants assert that, because the FTP policy extends to all Tenet Healthcare Corporation affiliates and subsidiaries, each of the named Defendants were intended to benefit from the FTP policy provisions and the PEA signed by Wegner.  (ECF No. 29 at PageID 501.)  In other words, when Wegner signed the PEA, in which he agreed that disputes would be arbitrated consistent with Tenet's FTP, and acknowledged receipt of the FTP, Defendants assert that he also was bound by the FTP's terms.

7

Wegner counters that the PEA provision that provides that "[n]othing in this Agreement, either expressly or implicitly, confers, or intends to confer, any rights or remedies upon **any person or entity <u>not a party</u> to this Agreement**, except as otherwise specifically stated herein," renders any entity other than St. Francis Physician Network LLC, the only signatory to the PEA other than Wegner, outside of the scope of the Arbitration Provision. (ECF No. 22 at PageID 448.)

The problem with Wegner's argument is that, by signing the PEA, he agreed that it would be read in conjunction with the FTP. Wegner accurately states that, under Tennessee law, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (ECF No. 22 at PageID 449 (quoting <u>Frizzell Constr. Co. v. Gatlinburg, L.L.C.</u>, 9 S.W.3d 79, 84 (Tenn. 1999)).) But to adopt Wegner's position, the Court would have to ignore the phrase in the PEA "except as otherwise specifically stated herein." The plain terms of the PEA specifically state that Wegner "acknowledges receipt of documentation regarding the Open Door Policy and Fair Treatment Process, including the arbitration process, prior to executing this Agreement." (ECF No. 8-2 at PageID 172.) Wegner's suggestion that he somehow is not bound by the terms of the FTP—when he explicitly agreed to be bound by it in the PEA—defies logic. By signing the PEA and agreeing to be bound by the terms of the FTP, Wegner has agreed to submit his claims against all of the Defendants listed in the FTP, which encompasses all of the Defendants here, to arbitration.

Wegner argues that the FTP is a unilateral internal policy, and "[t]here is no evidence that Dr. Wegner reviewed or agreed to the FTP's arbitration provisions, and mere reference to the FTP in the Physician Employment Agreement cannot substitute for mutual assent." (ECF No. 22 at PageID 451.) He relies in part on the decision in <u>Hergenreder v. Bickford Senior</u>

8

Living Group, LLC, 656 F.3d 411 (6th Cir. 2011), which he contends "is directly analogous" to his case. (Id. at PageID 450.) But there are several important distinctions between Hergenreder and this case.

There, Maureen Hergenreder was a nurse who sued her employer for wrongful termination under the Americans with Disabilities Act. Hergenreder, 656 F.3d at 413. After the trial court granted the employer's motion to stay the proceedings and compel arbitration and dismissed the case, the nurse appealed, asserting that she never agreed to arbitrate her claims. The Sixth Circuit reversed the district court's dismissal "[b]ecause there is no indication that Hergenreder was notified of the existence of the arbitration agreement, much less that she manifested an intent to agree to its terms." Id.

The court explained that, when the nurse began her employment, she signed numerous documents, but it was undisputed "that none of the[] documents mentioned anything about arbitration." Id. at 414. Although one of the documents Hergenreder signed was "an acknowledgment that she had read and understood the terms of [the defendant's] Employee Handbook," the "parties agree[d] that the terms of the Handbook are not part of a contract." Id. Nevertheless, the employer contended that the Dispute Resolution Procedure contained within the employee handbook, which described that employees agreed to arbitrate their claims against the employer, bound Hergenreder to arbitration.

The Sixth Circuit sided with the employee, explaining that "[t]he objective signs that [defendant] made Hergenreder an offer to be part of the arbitration agreement are few in number." Id. at 418. The court explained that, "[w]ere Hergenreder required to read, or even notified of the importance of reading, the D[ispute] R[esolution] P[rocedure], the analysis here might be different." Id.

9

Here the facts are different, as when Wegner signed the PEA he "acknowledge[d] receipt of documentation regarding the Open Door Policy and Fair Treatment Process, including the arbitration process, prior to executing this Agreement." (ECF No. 8-2 at PageID 172.) Unlike Hergenreder, Wegner was on notice of the FTP and its provisions, and explicitly agreed to be bound by the arbitration process outlined in it. His statement that "[t]here is no language in either the PEA or the FTP suggesting that Dr. Wegner agreed to arbitrate disputes with Tenet's corporate affiliates," contradicts the plain language of the documents in the record. As noted, the FTP "applies to Tenet Healthcare Corporation and its subsidiaries and affiliates other than Conifer Holdings Inc. and its direct and indirect subsidiaries (each, an "Affiliate"), any other entity or organization in which Tenet or an Affiliate owns a direct or indirect equity interest of greater than 50%, and any entity in which an Affiliate either manages or controls the day-to-day operations of the entity[.]" (ECF No. 8-3 at PageID 187.) Because the PEA provided that disputes would be arbitrated consistent with FTP, and the plain terms of the FTP encompassed all of the Defendants here, Wegner's claims against all of the Defendants are subject to arbitration.[3]

B. All of Wegner's Claims, Not Simply His Claim for Breach of Contract, Are Arbitrable

Having determined that all of the named Defendants are covered by the claims Wegner asserts, the remaining question is which of those claims are subject to arbitration. Wegner

---

[3] Wegner also compares the "At-Will Employment" provision in the FTP to a similar provision from the Employee Handbook in Hergenreder to argue that its language demonstrates that it is not a contract that could bind him. The FTP provision explains that "[n]othing in the FTP shall be construed to create a contract of employment, express or implied, nor does the FTP in any way alter the at-will nature of the employment relationship between the Company and its employees." (ECF No. 8-3 at PageID 192.) That provision does not change the fact that Wegner agreed to be bound by the FTP's terms.

concedes that the breach of contract claim, which is asserted only against St. Francis Physician Network, is arbitrable. But he asserts that his claims for retaliation under EMTALA, violation of the TPPA, and tortious interference with business expectancy, which are asserted against all Defendants, and his claim for defamation, which is asserted against St. Francis Hospital and Tenet, are not arbitrable. Each of those claims is addressed below.

          1.        Wegner's Claims Under EMTALA Are Arbitrable

Wegner asserts that federal courts have "recognized the supremacy of EMTALA's whistleblower protections," which "supports the conclusion that EMTALA retaliation claims are likewise not subject to private arbitration agreements when doing so would frustrate the statute's objectives." (ECF No. 22 at PageID 452–53 (citing Brooks v. Maryland General Hospital, Inc., 996 F.2d 708 (4th Cir. 1993)).)

Defendants counter that Wegner "fails to cite any case law which actually supports his assertion that his claim of EMTALA retaliation is not subject to arbitration," the EMTALA statute itself contains no such provision, and that, ultimately, the EMTALA whistleblower claim "is subject to arbitration because it essentially is a controversy related to the termination of Plaintiff's employment." (ECF No. 29 at PageID 503–04.)

Wegner's reliance on Brooks is unpersuasive. The question the Fourth Circuit addressed in that case was "whether a plaintiff seeking relief under EMTALA must first pursue arbitration required by state law for medical malpractice claims." 996 F.2d at 710. The court explained that it "question[ed] whether any state law, substantive or procedural, can defeat a federally created cause of action absent some express or implied incorporation of the state law in the federal act," and ultimately "conclude[d] that a claim under EMTALA would not in any event be within the scope of the Maryland Malpractice Act and therefore would not need to be

11

arbitrated in accordance with its terms." Id.  The holding from Brooks does not support Wegner's contention that "[a]rbitrating EMTALA retaliation claims would directly undermine the statute's fundamental purpose." (ECF No. 22 at PageID 453.)

The Court also finds persuasive the reasoning from Turcotte v. Baptist Healthcare of Oklahoma, Inc., the out-of-circuit case cited by Defendants.  In that case, the court concluded that the plaintiff's EMTALA whistleblower claim was subject to the arbitration provision of her employment agreement.  No. 05CV0323, 2005 WL 2789208, at *1 (N.D. Okla. Oct. 19, 2005).  The employment agreement included similarly broad language to the agreements Wegner entered into here, subjecting "any controversy or claim arising out of, or in connection with, this Agreement, or any breach or asserted breach thereof," to arbitration.  Id. at *2.  Relying on the FAA and the "closely analogous" Oklahoma Uniform Arbitration Act, the court concluded that, given the terms of the employment agreement, along with the strong state and federal policies favoring arbitration, the EMTALA claims were subject to arbitration.  Id. at *3.  That finding is equally applicable here.

Moreover, as the FTP itself acknowledges, certain "non-waivable statutory claims," are not subject to exclusive review under the FTP, including "claims within the jurisdiction of the National Labor Relations Board, wage claims within the jurisdiction of a local or state labor commissioner, or administrative agency charges before the Equal Employment Opportunity Commission or similar local or state agencies[.]"  (ECF No. 29 at PageID 502.)  The fact that the FTP does not include EMTALA claims as among those that are non-waivable is not dispositive, of course, but, as Defendants assert, there is nothing in EMTALA's statutory language that would support that conclusion.  Given the foregoing, Wegner's EMTALA claims against all Defendants are subject to arbitration.

12

### 2. Wegner's Claims Under the TPPA Are Arbitrable

Just as Wegner's EMTALA claims are subject to arbitration, so, too, his claims under the TPPA. Wegner argues that the TPPA "embodies significant public policy interests and provides an additional substantive remedy to protect constitutional rights," and that it is "explicitly intended to supplement remedies available under common law, statutory law, constitutional law, and the Tennessee Rules of Civil Procedure." (ECF No. 22 at PageID 454.) Ultimately, Wegner argues, the TPPA's "broad construction reflects the Tennessee legislature's intent to protect these vital public interests against private contractual waivers." Id.

Defendants counter that Wegner "cannot avoid arbitration because he asserts that the statute is intended to effectuate public policy," and that "[h]e cites no case law in which a court has held that a TPPA claim is exempt from mandatory arbitration by nature of the interest protected by the TPPA." (ECF No. 29 at PageID 504.)

The Court does not challenge Plaintiff's assertion that "[t]he TPPA safeguards fundamental constitutional rights, including the rights to petition, to speak freely, to associate freely, and to participate fully in government." (ECF No. 22 at PageID 454.) But it does not necessarily follow that the Tennessee legislature intended to bring TPPA claims outside of the realm of arbitration. Plaintiff has identified no authority to support such a conclusion, and at least one of the cases cited by Defendants explicitly rejects the position. See Martin v. WM Middle Tennessee Env't Ctr., LLC, No. 23-CV-01343, 2024 WL 1723047, at *2 (M.D. Tenn. Apr. 22, 2024) (concluding that an employment agreement that "explicitly state[d] that the arbitration agreements cover disputes over the arbitrability of claims for violations of any state or federal laws" rendered claims under the TPPA arbitrable). The language in the employment agreement at issue in Martin resembles the broad language found in the FTP here, which

13

explains that "[e]xamples of the types of disputes or claims covered by the FTP and the arbitration agreement include, but are not limited to, claims for wrongful termination of employment, breach of contract, . . . tort claims or any other legal claims and causes of action recognized by local, state or federal law of regulations." (ECF No. 8-3 at PageID 188.) The Court is unwilling to read into the TPPA language such claims are removed from being arbitrated, given the agreement among parties. Therefore, Wegner's TPPA claims against all Defendants are subject to arbitration.

                3.       Wegner's Claims for Tortious Interference with Business Expectancy and Defamation Are Arbitrable

Wegner asserts that neither his tortious interference with business expectancy nor his defamation claims are arbitrable because both arise from post-termination actions by Defendants. Wegner argues that "Courts generally decline to compel arbitration of tort claims based on post-employment conduct absent clear and unmistakable contractual language requiring it—and no such language exists here." (ECF No. 22 at PageID 455, 457.) According to Wegner, "[w]hile some courts have compelled arbitration of post-termination tort claims, those cases involve arbitration clauses with expressly broad language covering disputes about the enforcement or interpretation of the agreement." (Id. at PageID 456.)

Defendants counter that, not only is the contractual language broad enough to encompass such claims, but also that "there is no way Plaintiff can logically assert that his 'tortious interference with business expectancy' claim and his defamation claim are not 'relat[ed] to or arising out of . . . the termination of [his] employment' and thus clearly covered by the FTP Policy." (ECF No. 29 at PageID 504.)

As a starting point, the FTP's language citing "tort claims" is likely broad enough to encompass Wegner's tortious interference and defamation claims. But even if it were not, the

14

allegations in those two counts demonstrate that they are inextricably intertwined with his termination.  Wegner asserts that "Defendants intentionally interfered with" his relationships with his existing and future bariatric patients "by denying him access to patients and records, falsely characterizing his departure, and installing unqualified personnel to assume his responsibilities."  (ECF No. 1 at PageID 23.)  Similarly, in his claim for defamation, Wegner alleges that Defendants damaged him "in the way that his termination was handled and the lack of communication, external and internal transparency, and without adequate or reasonable transition and external communication published defamatory messages to the Memphis and National medical communities, which will have permanent, severe, and devastating professional and financial harms and losses to Dr. Wegner."  (Id. at PageID 24.)

Neither of the out-of-circuit cases Wegner cites involved similarly intertwined claims.  See Dean Witter Reynolds, Inc. v. Ness, 677 F. Supp. 866 (D.S.C. 1988); Fontana v. Southeast Anesthesiology Consultants, P.A., 729 S.E.2d 80, 87 (N.C. App. 2012).  Even more important, the Sixth Circuit concluded in Aspero v. Shearson Am. Exp., Inc., 768 F.2d 106 (6th Cir. 1985), that similar tort claims, there, for defamation, invasion of privacy, and intentional infliction of emotional distress, were subject to arbitration.  The court concluded that, even though the plaintiff's claims were based on actions that happened after her termination, they were covered by the clause in her employment agreement that incorporated[4] an obligation to arbitrate "[a]ny controversy . . . arising out of the employment or termination of employment."  Id. at 107.

---

[4] The plaintiff in Aspero was employed as a broker in the Memphis office of Shearson American Express.  Her employment agreement provided that she would be bound by the rules of the organizations with which she registered.  768 F.2d at 107.  She was registered with the New York Stock Exchange, which had a rule that "[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration."  Id.

15

Wegner's claims are arguably even more intertwined with his employment than the claims at issue in Aspero, and more closely timed to his termination. Because they are, the tortious interference and defamation claims, like the rest of Wegner's claims, are subject to arbitration.

## CONCLUSION

Consistent with the foregoing, all of the Defendants are covered by the arbitration clause found in the PEA and FTP. Similarly, each of the claims in Wegner's complaint are subject to arbitration. Accordingly, to the extent Defendants seek to compel arbitration of Wegner's claims, their Motion is **GRANTED**.

However, to the extent that Defendants seek to dismiss the case, the Motion is **DENIED**. Section 3 of the FAA provides that, "when any issue in a suit is subject to arbitration, the court 'shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.'" Smith v. Spizzirri, 601 U.S. 472, 476 (2024). So, "[w]hen a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration." Id. at 475–76.

Plaintiff opposed the motion to compel arbitration, but did not directly address whether the matter should be stayed or dismissed upon a finding that the claims in this matter are arbitrable. Although Plaintiff has not moved to stay the matter pending arbitration, the Court nevertheless **STAYS** the matter, pending the outcome of the arbitration. If the Parties agree that the matter should instead be dismissed, they shall notify the Court within seven days of the

16

entry of this Order. Otherwise, the matter will remain stayed pending the outcome of the arbitration. The Parties shall notify the Court within thirty days of the conclusion of the arbitration of the status of the case.

    **IT IS SO ORDERED,** this 17th day of February, 2026.

                                                            s/ Sheryl H. Lipman
                                                             SHERYL H. LIPMAN
                                                             CHIEF UNITED STATES DISTRICT JUDGE